Kenneth D. POWELL, Appellant,

v.

UNITED STATES, Appellee.

No. 00–CF–1618.

District of Columbia Court of Appeals.

Argued Jan. 13, 2005.
Decided Aug. 4, 2005.

Amit Mehta, Public Defender Service, with whom James Klein and Samia Fam,

Public Defender Service, were on the brief, for appellant.

Elizabeth H. Danello, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, John R. Fisher, Elizabeth Trosman, Julieanne Himelstein and Deborah L. Connor, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ and WASHINGTON, Associate Judges, and STEADMAN, Senior Judge.

STEADMAN, Senior Judge:

This appeal arises from appellant, Kenneth Powell's, conviction at a bench trial for misdemeanor sexual abuse in violation of D.C.Code § 22–4106 (1981).[1] Shortly after he was convicted, appellant filed a motion to vacate the verdict which the trial judge denied. The issues appellant raises on appeal are the same as those that he argued to the trial judge at the motion to vacate. Appellant's arguments are tied to an evidentiary "sex kit" compiled from an examination of the victim a few hours after the assault took place. Appellant contends that the government did not disclose the existence of the kit, as well as the results of tests later performed on the kit, thereby violating *Brady v. Maryland,* 373 U.S. 83,

83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and Super. Ct.Crim. R. 16. Appellant also contends that during the course of the trial the government, on two occasions, misrepresented the state of the evidence, thus violating his due process rights against the knowing use of false evidence, and entitling him to a new trial under what might be termed the *Mooney/Napue* line of cases.[2] We uphold the denial by the trial court of the motion to vacate and affirm the judgment.

## I. The Trial

Appellant was convicted of misdemeanor sexual abuse for placing his finger in the vagina of a five-year-old girl, B.S. Appellant's wife, Shauna Kenny, had been B.S.'s babysitter since B.S. was approximately five months old. On the day in question, while on her way to work, B.S.'s mother, F.O., took B.S. and B.S.'s two-year-old sister to appellant's home at 4:35 a.m.[3] Appellant opened the door to the home. The mother placed the children in the bed with Shauna Kenny, and then left to go to work.[4]

The mother returned to pick the children up at approximately 8:00 p.m. Appellant answered the door again and informed the mother that Shauna Kenny had gone to the grocery store. The mother then

---

1. The statute provides in relevant part:
 Whoever engages in a sexual act or sexual contact with another person and who should have knowledge or reason to know that the act was committed without that other person's permission, shall be imprisoned for not more than 180 days and, in addition, may be fined in an amount not to exceed $1000.
 The statute has since been recodified at D.C.Code § 22–3006 (2001). Appellant was sentenced to a term of imprisonment of 180 days, to run concurrently with any other sentence appellant was serving.

2. *Napue v. Illinois,* 360 U.S. 264, 269–72, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (setting

 aside conviction resulting from the state allowing known false testimony to go uncorrected); *Mooney v. Holohan,* 294 U.S. 103, 112–14, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (noting that knowing use of perjured testimony by state actors implicates the defendant's Fourteenth Amendment due process rights).

3. The mother is a Metro bus driver and was due at work at 5:00 a.m.

4. The mother testified that she first met the appellant two days before the day in question. She had never met the appellant prior to that because he had been in jail.

collected the children and walked home the three or four minute walk to their house.

Shortly after arriving home, the mother instructed B.S. to undress for a bath. B.S. went to the bathroom, began urinating, and started screaming, "mommie, it hurts, it burn [sic]." The mother testified that when she went into the bathroom, B.S. "was holding herself, and I said what's wrong, and I lift [sic] her up and there was [sic] little bits of blood dropping in the toilet." She further testified that when she picked B.S. up, she " laid her on the bed, and then that's when [she] saw the blood coming out of her." When questioned further, she described the amount of blood coming out of B.S. "as like medium blood, like you cut your hand, and you wipe it and it starts back bleeding, that kind of blood." The mother asked the child if she had scratched herself. B.S. replied, "no, Kenny touched me in my no-no, put his finger in my no-no." "No-no" was what B.S. called her vagina.

The mother testified that she then redressed the child in the same underwear, and took her to the Children's National Medical Center. The medical records entered at trial show that B.S. was seen by a triage nurse at 10:50 p.m. and then a Sexual Assault Nurse Examiner, Mary Allen–Rochester, performed a gynecological examination as well as a thirteen-step procedure for a police "sex kit" at approximately 12:13 a.m.[5] At trial, Nurse Allen–Rochester testified that there was "redness and tenderness to [the] touch in the area of [the child's] vagina around the hymen." She also testified that a test using ultra-violet light revealed an unidentified fiber in the vaginal area which the nurse testified was "not something that you normally find" in the vaginal area of a girl that age.[6] She testified that she "did not note any cuts" and that she did not see any blood on either the child or her underwear. The nurse also testified that the "procedure is that [after she completes the sex kit, she] put[s] it in the refrigerator and the police come and pick it up." She also testified that she was unaware if in fact someone had picked up the sex kit in this case.

B.S., who was six years old at the time of trial, testified that appellant stuck "his finger in [her] no-no." She testified that at the time of the assault, appellant was on the couch and she was sitting on the floor. She testified that after she had come home from the babysitter, she was urinating and then "start[ed] to bleed."[7]

Appellant did not testify at trial. The only witness for the defense was a defense investigator who testified regarding a conversation he had had with the mother.[8]

5. The thirteen-step examination involves, among other things, a smear and cultures of the mouth and throat, a vaginal exam, blood samples, saliva samples, and a rectal exam.

6. According to Nurse Allen–Rochester's testimony this test is not able to detect blood.

7. The day after the assault, B.S. met with a counselor at the Children's Advocacy Center. There are some inconsistencies between B.S.'s testimony at trial, the information she gave to the counselor at the Children's Advocacy Center, and the information she gave to Nurse Allen–Rochester. At trial, she testified that she was watching television when appel-

lant touched her but she told the counselor that she had been asleep at the time. At trial she testified that appellant touched her on the outside of her clothes but the hospital records reflect that she told Nurse Allen–Rochester that appellant pulled down her pants.

The interview at the Child Advocacy Center was videotaped and played for the judge. The record does not include the videotape or a transcript of the videotape. However, the government has acknowledged in its brief the above-described inconsistencies in the child's story.

8. The defense investigator was called to impeach the mother concerning the content of a

The defense also entered into evidence a stipulation that Detective Timothy Hairston had interviewed the mother during the course of his investigation. The stipulation was offered to impeach the mother's testimony that she had never spoken with a police officer or detective about the case.

The trial judge delivered his verdict the day after the trial had concluded. The trial judge noted that this "case is not without problems." He noted that the child had some difficulty with concepts including "time and space, what happened before or after something else happened and also had some difficulty understanding hypothetical questions about what things were true and what things were not true ... [but] [t]hat's not surprising, given her age." Despite the fact that "[s]he is by no means a perfect witness and she gets things wrong, which is what causes some of the problems for a fact finder in determining what actually happened in this case, but I do not believe that she is incompetent to testify." He went on to say that "perhaps because of the passage of time between February 8th [the day of the event] and today ... almost a year and a half later, and perhaps because of the trauma of the events and other factors ... there are numerous discrepancies in her testimony ... between the various things she has said beginning on [the day of the event] and continuing until yesterday, when she testified at trial." He then stat-ed, "... having thought about it over and over again and review[ing] both my notes of the testimony and the tape of her initial interview and the transcript and the other evidence in the record, including the medical records of her examination on February 9th, I come away convinced beyond a reasonable doubt that [B.S.] did not make this up and that ... [appellant] did place his hand and his finger in her vaginal area ...." He went on to state, "I do not know whether his hand was inside her pants or outside her pants, whether her pants were up or down, whether she was wearing short pants or long pants, whether he reached over to her while still sitting on the couch or came off the couch to where she was on the floor ... I do know, however, beyond a reasonable doubt, that he did it; that she told him to stop, and he did; that he did it with enough force to cause her pain when she urinated that night, to cause bleeding, redness and tenderness to the touch, all of which was corroborated by other witnesses, including her mother and the nurse who examined her ... ultimately I credit [B.S.] and credit the other witnesses on the essential facts of the assault."

## II. The Motion to Vacate

Twelve days after the verdict was entered, appellant filed a motion to vacate the verdict.[9] The motion to vacate was

conversation between the mother, the investigator, and appellant's trial counsel, Mr. Carrington. The mother had testified that the only question Mr. Carrington had asked her, during the conversation in question, was whether B.S. had eczema and that he had not asked her anything about the events of the day in question. The investigator's only relevant testimony on the issue was that he recalled the conversation lasting ten minutes. He did not testify to the content of the conversation.

It is not clear from the investigator's testimony whether he and the mother were tes-tifying about the same conversation. The investigator's testimony suggests that the conversation, which he was recalling, was between him and the mother; there is no indication that Mr. Carrington was present. We also note that, like the trial judge, we have difficulty understanding the impeachment value of the investigator's testimony.

9. At this time, the sex kit had not yet been located. However, by the time the government filed its opposition, the location of the kit and the FBI results were known. In denying the motion to vacate, the trial court con-

precipitated by a very unusual set of circumstances involving the sex kit. Although both parties were or should have been aware prior to trial that a sex kit had been completed,[10] for reasons that are not explained in the record before us, neither side appears to have investigated into the current existence and contents of the sex kit or the results of any tests thereon. At trial, Nurse Allen–Rochester testified about completing the sex kit and the normal procedures followed thereafter,[11] but neither party questioned her further on the subject while she was on the stand.

Immediately after Nurse Allen–Rochester testified on the morning of June 27, the government asked her to return to the hospital and try to locate the sex kit. Prior to closing arguments later that same afternoon, she informed government counsel that the sex kit had been signed out to a Metropolitan Police Department ("MPD") detective. There was no suggestion from the police reports, or any other paperwork prepared in conjunction with the case, that that particular detective had ever been involved in the case.[12] As soon as the trial concluded, the government contacted the detective who was unable to recollect retrieving the sex kit and needed to review her files and notes. Two days after trial, on June 29 or 30, the government advised defense counsel that it was attempting to learn the whereabouts of the sex kit and whether in fact the kit was in the government's possession.[13]

Several days later, the detective determined that she had indeed retrieved the kit from the hospital. On July 18, the prosecutor learned that the sex kit was located at the MPD Mobile Crime Unit.

---

sidered the same *Napue*, Rule 16 and *Brady* arguments raised in this appeal.

10. In response to the defense's discovery requests, which included a request for all documents and reports related to any examinations of the complaining witness in this case, specifically the results of any tests performed in conjunction with the completion of the sex kit, the government produced documents which made clear that a sex kit had been completed but did not make mention of whether it had ever been retrieved from the hospital and tested. Specifically, the Emergency Treatment Record, which was turned over to the defense, stated that a "SANE Kit" was completed. "SANE" is an acronym for Sexual Assault Nurse Examiner. During the motion to vacate the verdict, defense counsel conceded that he had received that documentation.

11. The defense did ask her:
Q. And is it your procedure once the sex kit is completed to give that to the Metropolitan Police Department?
A. No, it's not.
Q. What happens?
A. The procedure is that you put it in the refrigerator and the police come and pick it up.

Q. Do you know if they did that in this case?
A. No, I don't know that.
Defense counsel did not object or inquire as to whether the government was in possession of the kit or request an opportunity to learn whether the nurse or the hospital could locate the kit.

12. The government concedes that, at the moment they learned this minimal information, the "more prudent course" would have been to disclose the information to the defense. The government notes on the other hand that when they learned this information, the prosecutors themselves had not yet reviewed the hospital records nor were there any indications from the government's files or the detective's notes that the sex kit had indeed been retrieved from the hospital. There certainly was no indication that the sex kit had been tested.

13. The details regarding the government's efforts to locate the kit were set forth in the Government's Opposition to Defendant's Motion to Vacate the Verdict. There is no indication from the record that appellant challenges the government's representation of their efforts to track down the sex kit.

On July 19, the government advised defense counsel that the kit had been located. That same day the prosecutor learned that the FBI had performed tests on the kit. On July 20, the government received copies of all documentation relating to the sex kit, including the FBI test results, and forwarded them to defense counsel that same day.

The FBI test results revealed that they had examined the following evidence: (1) four vaginal swabs (labeled Q1–Q4); (2) two vaginal smears (labeled Q5–Q6); (3) two rectal swabs (labeled Q7–Q8); (4) one rectal smear (labeled Q9); (5) two oral swabs (labeled Q10 and Q11); (6) one oral smear (labeled Q12); (7) dried secretions (labeled Q13–13.1) and; (8) panties (labeled Q14). The relevant results were as follows:

A chemical test for the possible presence of blood was positive on specimen Q14; however, the presence of blood was not confirmed. Specimens Q1 through Q4, Q7, Q8, Q10, Q11, Q13 and Q13.1 were examined for the presence of blood; however, none was found.

At the time of sentencing on September 21, the trial judge heard arguments on appellant's motion to vacate the verdict and denied the motion.

### III. Brady

■■■ We begin with appellant's first argument, which is that the government violated *Brady, supra,* by failing to disclose that the sex kit was in its possession and by failing to disclose the results of the FBI analysis of the kit. *Brady* requires the government to disclose information that is favorable to the accused and "material either to guilt or punishment." 373 U.S. at 87, 83 S.Ct. 1194. Evidence is "material" within the meaning of the *Brady* doctrine, however, only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (citations omitted). The burden to prove materiality as so defined is on the appellant. *Bennett v. United States,* 763 A.2d 1117, 1125 n. 9 (D.C.2000).

Appellant contends that because B.S.'s testimony was inconsistent in certain regards, the government relied heavily on the mother's testimony to corroborate her daughter's claims and that if he had been aware of the results of the sex kit analysis from the beginning, "he could have used it to raise serious doubts not just about [the mother's] purported observation of blood but about her testimony as a whole. That evidence places this case in such a different light that it should cause this Court to doubt the integrity of the verdict."

Although the government concedes that it failed to disclose the evidence,[14] it maintains that its failure to disclose does not constitute a *Brady* violation because the evidence was not material within the meaning of *Brady.* First, the government contends that the evidence does not in fact favor the defense and "[i]f anything, the FBI analysis helped the government." The government points out that the tests revealed two reddish-brown pinpoint stains in B.S.'s underpants and that the stains

---

**14.** The government also concedes that the prosecutor's lack of actual knowledge, and therefore any bad faith, is not relevant to the *Brady* analysis. As the government points out in its brief, the MPD and the FBI were part of the government team and their knowledge is imputed to the prosecutors. *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

tested positive for the "possible presence of blood." The government maintains that even though the presence of blood could not be confirmed, the stains corroborated the mother's testimony that B.S. bled. The government maintains that "[a]t most [the evidence] proved that B.S. was not bleeding at the time she was examined, four hours after her mother claimed to have seen blood." According to the government, the evidence "bore only indirectly on the more relevant question whether the child bled shortly after the assault."

After considering the motion to vacate the verdict, the trial judge stated that he saw "absolutely no basis in the record [,] to conclude that whatever is now known about the sex kit and the results of scientific testing that may have been done [,] that would have improved the defendant's position." The trial judge noted, "[t]here isn't much in the analysis one way or the other. But there is now known to the Defense that there were two very small stains in the complainant's underpants that were consistent with human blood ...." He then accurately described the mother's testimony at trial about the blood she observed and the nurse's testimony that she did not see blood in B.S.'s underpants. He observed that further testing of the suspected blood stains could have had one of two results. If the stains were indeed blood, this would tend to confirm the mother's testimony. If they were not blood, the sex kit evidence "is somewhat cumulative since the nurse's testimony was already in the record from which the Defense had every basis to argue that the complaining witness and her mother were not credible in their description of the critical events." He could not conclude that the "evidence is of such materiality that its production or its lack of production ... undermines the Court's confidence in the outcome of the trial" and thus determined that the defense had not met its burden of proving materiality in accordance with *Brady*.

■ We first consider the applicable standard of review in this case. Cases from this court have stated that where the trial court determines that the undisclosed *Brady* material would not have materially affected the verdict, we consider whether that ruling was reasonable.[15] *McCoy v.*

15. We note that the trial judge in this case was the finder of fact and also the determiner of *Brady* prejudice. It appears that the circuits are split on the significance of this fact. In *Bagley v. Lumpkin*, 798 F.2d 1297 (9th Cir.1986), the Ninth Circuit's analysis conflicts with language set forth in an Eight Circuit decision, *Patterson v. Black*, 791 F.2d 107 (8th Cir.1986).

In *Bagley*, the trial judge also heard the defendant's post-trial *Brady* motion. *Id.* at 1299. In his order denying relief, the trial judge specifically stated that he was "in a unique position of being able to know what effect the disclosure ... would have had upon the decisions made by this Court in the criminal prosecution." *Id.* He concluded that "disclosure would have no effect at all upon [his] finding that the government had proved beyond a reasonable doubt that defendant was guilty." *Id.*

The Ninth Circuit reversed the district court judge and the case was appealed to the Supreme Court which remanded it to the Ninth Circuit for it to determine whether there was a reasonable probability, had the evidence been disclosed, that the result of the proceeding would have been different. *See United States v. Bagley*, 473 U.S. 667, 684, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

On remand, the Ninth Circuit considered the district judge's conclusion that the disclosure of the evidence would not have affected the outcome of the trial. *Bagley v. Lumpkin*, 798 F.2d at 1301. The Ninth Circuit noted that, "[t]he inquiry is not how this or any other judge, as the trier of fact, would subjectively evaluate the evidence. It is, rather, how the absence of the evidence objectively might have affected the outcome of the trial." *Id.*

In *Patterson, supra*, 791 F.2d at 110, on the other hand, the Eight Circuit discussed the

*United States,* 760 A.2d 164, 184 (D.C. 2000); *Sterling v. United States,* 691 A.2d 126, 134 (D.C.1997). In *Farley v. United States,* however, the question was raised whether, under relevant Supreme Court decisions, *Brady* rulings should properly be reviewed *de novo.* 767 A.2d 225, 228 (D.C.2001); *see id.* at 233 (Ruiz, J., dissenting). We need not resolve that dispute here, since we are not persuaded that under either standard, *Brady* materiality has been demonstrated here.

 To determine whether the evidence was material, we first consider the evidentiary value of the sex kit and the tests performed on the kit.

We note at the outset that both parties were aware that a sex kit had been completed.[16] Therefore, it was not so much the existence of the sex kit itself that the government failed to disclose but rather the results of the tests performed by the FBI on the sex kit. The results of the tests, however, as noted by the trial judge, are far from unequivocally favorable to either side. True, the swabs taken from B.S.'s mouth, rectum, vagina, and secretions conclusively show the absence of blood. However, the analysis of the underpants showed that blood was possibly present. On the one hand, this result could favor the government because the mother testified that she had seen blood, both in the toilet and on the child's vagina. On the other hand, the results favor appellant because they indicate that even if there was blood, it was a lot less blood than the mother claimed to have observed.

This leads us to whether appellant can meet his burden to establish materiality under *Brady.* Appellant maintains that because the tests revealed that there was very little blood in the underwear, if any, he could have used the sex kit evidence to discredit the mother's testimony that she saw blood.

First, we note that the underpants tested positive for the possible presence of blood; therefore, the defense could only have used the test results to impeach the mother regarding the extent of the bleeding, not whether she had in fact seen blood at all.

Second, in this regard, careful note should be taken of the mother's precise testimony about the extent of the bleeding she observed. A review of the mother's testimony in this case indicates that her testimony was not that she observed a dramatic amount of bleeding, as appellant maintains, but rather that the bleeding she observed was of a somewhat more limited nature. Specifically the mother testified that when B.S. screamed in pain, she went into the bathroom, picked B.S. up off the toilet, "and there was [sic] little bits of blood dropping in the toilet." She also testified that after she picked the child up, she laid her on the bed, "and then that's when I saw the blood coming out of her." When asked how much blood she saw, she testified "the amount you would say but it was like medium blood, like you cut your

benefit of the trial judge also hearing the post-trial motion, in the context of distinguishing the case before it (where that was not the case), from *United States v. Bagley.* The Eight Circuit stated, "[w]e would additionally question the reach of *Bagley* in light of the fact that it was a bench trial (unlike the instant case), and that the same judge who tried the case denied the motion for a new trial." It went on to say, "[a]s a result, any reasonable probability could have been resolved by the district court as finder of fact without the inherent difficulty [present in a jury trial such as this] of reconstructing in a post-trial proceeding the course that ... the trial would have taken had the defense not been misled by the prosecutor ...." *Id.*

16. See note 10, *supra.*

hand, and you wipe it and it starts back bleeding, that kind of bleeding." [17]

Considering what the mother's actual testimony was regarding the amount of blood she saw, we do not believe that the fact that the tests revealed that there were only two small pinpoints of blood would have had as much impeachment value as appellant now contends. We do not agree that this evidence would have allowed the defense "to raise serious doubts not just about [the mother's] purported observation of blood but about her testimony as a whole" thus placing "this case in such a different light that it should cause this Court to doubt the integrity of the verdict." [18]

Furthermore, the defense had the opportunity to raise serious questions about the mother's credibility at trial using stronger evidence than a test that reveals two small pinpoints of blood. The nurse, as the defense noted during the motion to vacate, was the closest thing to an expert witness in this trial. She testified that during her extensive examination of the child, which involved a gynecological exam and a thirteen-step sex kit, she did not observe *any* blood. The nurse's testimony was damaging testimony which brought into question the mother's testimony about

seeing blood. Yet, not only did the defense never question the mother on cross-examination about the amount of blood she witnessed, the defense also did not recall her to the stand later to challenge her testimony in light of the nurse's testimony that her extensive examination did not reveal any blood. Like the trial judge, we fail to see how the ambivalent evidence of the sex kit tests would have significantly amplified the defense position in this regard.

In sum, we agree with the trial judge that the government's failure to disclose the test results did not amount to a violation under *Brady*.[19]

## IV. Mooney/Napue

█ Alternatively, appellant argues that under the *Mooney/Napue* line of cases, he is entitled to a new trial. That line of cases deals with what one might view as a subset of the broad field of government impropriety in prosecuting a case that violates a defendant's due process rights, of which *Brady* is another subset. *Brady* addresses situations where the government fails to turn over evidence in its possession favorable to a defendant. *Mooney/Napue* deals with a situation where the prosecu-

---

17. Appellant's contention that the mother purported to have observed considerable bleeding likely stems from a notation in the Emergency Treatment Report that "mom looked and noticed blood on legs and going toward buttocks." We note that the mother did not testify, at trial, that she observed blood on the child's legs going toward her buttocks. We also note that the prosecutor did not argue in her closing that the mother observed substantial blood of this nature.

18. Appellant suggests that, faced with the test results, the mother in cross-examination might have actually modified or recanted her account. No such argument was made to the trial judge and it strikes us as pure speculation.

19. Appellant also argues that the government violated Super. Ct.Crim. R. 16 in not producing the sex kit results. While the government concedes the violation, the decision whether to impose any sanctions for violation is left to the trial court's discretion. *Gethers v. United States*, 684 A.2d 1266, 1272 (D.C.1996), *cert. denied*, 520 U.S. 1180, 117 S.Ct. 1458, 137 L.Ed.2d 562 (1997). Given that the only sanction available in the circumstances here would be an order vacating the verdict and the considerations already discussed with respect to the *Brady* issue, we cannot say that the trial court abused its discretion in refusing to enter an order vacating the verdict. *See Allen v. United States*, 649 A.2d 548, 552 (D.C.1994).

tion knowingly makes use of false evidence at trial. "Of course, a prosecutor may not knowingly present false evidence or permit evidence, known to be false, to go uncorrected . . . A defendant is accordingly entitled to a new trial if there is 'any reasonable likelihood' that false testimony could 'have affected the judgment of the jury.'" *Felder v. United States*, 595 A.2d 974, 977 (D.C.1991) (citing and quoting *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and *Napue*, 360 U.S. at 271, 79 S.Ct. 1173). Analogous to *Brady*, the burden is on the appellant to demonstrate that he is entitled to relief. *Cf. Strickler, supra*, 527 U.S. at 291, 119 S.Ct. 1936.

■ Appellant argues that these principles apply to two instances in closing argument where, he alleges, the prosecutor misrepresented the evidence by making arguments to the court based on a premise that the prosecutor knew to be false; viz., that the government never had in its possession the physical evidence of the sex kit.[20]

Appellant contends that the first misrepresentation occurred when the prosecutor, during her closing argument, incorrectly described the child's burning sensation and bleeding as "physical evidence." Defense counsel immediately objected stating, "I don't think that's physical evidence. I think it's testimonial evidence. There is no physical evidence." [21] The trial judge responded, "[f]air enough, I think [the government attorney] slipped, but I understood her point." According to appellant, the government's silence in the face of defense counsel's objection and the trial court's comment "plainly was misleading, if not outright false" and thus warrants a new trial under *Mooney/Napue*.

Appellant contends that the second misrepresentation took place when the government objected to defense counsel's missing evidence argument. Specifically, during his closing argument, defense counsel stated, "I think it's fair to say that if there had been blood or some kind of physical evidence, the Government would have brought it in here." To which the prosecutor responded, "[h]e's arguing missing evidence and there has been no request for a missing evidence instruction and there has been no evidence in this case that the Government was in possession of any of the evidence he's arguing we don't have or didn't come up with." The trial judge overruled the objection and stated, "I didn't take [defense counsel's] argument to mean I should draw an adverse or negative inference. . . . He's saying there is no physical evidence to corroborate what the Government alleges happened here. The witness says there was blood and there is no evidence of blood except her testimony. That's a fair inference, I think."

We might note at the outset our considerable doubt that any misrepresentation in the *Mooney/Napue* sense occurred here at all. As the trial court itself noted, the

**20.** Appellant's *Mooney/Napue* argument appears to go only to the prosecutor's knowledge that the sex kit had been picked up by the detective and could still be in the government's possession, which is all that the prosecutor knew at the time of closing argument, and not that *Napue* imputes to the prosecutor knowledge of other law enforcement agencies, as with *Brady*, which would encompass knowledge of the actual results of the FBI tests. While the *Napue* doctrine does extend to knowledge of the prosecutor's office as a whole, *see Giglio, supra*, no case is cited that the principle extends to the knowledge of all components of the law enforcement community.

**21.** Appellant concedes that "[i]t is true that defense counsel was referring to what was in the record—the absence of physical evidence."

reference to the child's burning and bleeding as "physical evidence" appeared to be a slip of the tongue and the objection to missing evidence addressed the actual state of the record at that time. Furthermore, in that regard, defense counsel as well as the prosecutor knew that a sex kit potentially existed as possible physical evidence. Nonetheless, assuming arguendo that the holdings in *Mooney/Napue* extend to actions in closing arguments (and not just evidence/testimony), and that the two instances here were misrepresentations, we conclude that appellant has not met his burden of showing that the misrepresentations could in "any reasonable likelihood ... have affected the judgment of the [trial court]." *Felder, supra*, 595 A.2d at 977 (citations and quotations omitted).

As the Supreme Court noted in *Smith v. Phillips*, 455 U.S. 209, 220 n. 10, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982):

> Even in cases of egregious prosecutorial misconduct, such as the knowing use of perjured testimony, we have required a new trial only when the tainted evidence was material to the case. (Citations omitted.) This materiality requirement implicitly recognizes that the misconduct's effect on the trial, not the blameworthiness of the prosecutor, is the crucial inquiry for due process purposes.

Although appellant wraps his alternative argument in *Mooney/Napue* doctrine, the thrust of his claim of prejudice aims at the government's failure to apprise him of the possession by the government of the sex kit and, perhaps, the test results. It appears to us that the alleged prejudice arising from these claimed misrepresentations is for all practical purposes virtually indistinguishable from that alleged with respect to the *Brady* violation, which we have discussed at length in part III and need not repeat here.[22] We agree with the trial judge that the *Mooney/Napue* doctrine does not call for a new trial.[23]

Accordingly, the judgment of conviction is

*Affirmed.*

---

**22.** With specific reference to the missing witness argument, the trial court noted that even if the government attorney had disclosed to defense counsel that she had information that a MPD detective had checked out the sex kit, she "would have been well within her rights to object to [what the government perceived as a missing evidence] argument as going beyond what would be permissible on the state of the record ... [s]o I really see absolutely no issue ... that would entitle [appellant] to any relief." Indeed, the decision to give a missing evidence instruction is within the discretion of the trial court. *Harris v. United States*, 602 A.2d 154, 162 (D.C.1992) (en banc).

**23.** We think it appropriate, however, to repeat our recent admonition that prosecutors seek precision of language to guard against inviting inferences of fact arguably contrary to evidence of which they are aware but which is not of record in a case. *See (Kalani) Williams v. United States*, 877 A.2d 125, 129 (D.C.2005).