*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CO-53

UNITED STATES, APPELLANT,

v.

DERRIE A. NELSON, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(FEL-1057-85)

(Hon. Todd E. Edelman, Motions Judge)

(Argued June 20, 2018                              Decided October 3, 2019)

*Valinda Jones*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *Mark A. Aziz*, and *Eric Hansford*, Assistant United States Attorneys, were on the brief, for appellant.

*Alice Wang*, Public Defender Service, with whom *Samia Fam* and *Jonathan Anderson*, Public Defender Service, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and EASTERLY, *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*: On May 27, 1986, a jury found appellee Derrie Nelson guilty of felony murder while armed of Robert Nichols, assault with intent to kill while armed ("AWIKWA") and armed kidnapping of a second victim, Leonard Kelly, first-degree burglary while armed, and carrying a pistol without a

license ("CPWL").[1]  Nelson was thereafter sentenced to forty-two years to life in prison.  On direct appeal, we vacated Nelson's armed burglary conviction as duplicative of the felony murder but affirmed the remainder of his convictions.[2]  In 2015, Nelson moved to vacate all of his convictions and for a new trial, pursuant to D.C. Code § 23-110 (2012 Repl.) and *Napue v. Illinois*, 360 U.S. 264 (1959), claiming that the government presented false and misleading evidence – expert testimony on hair fiber comparison – that prejudiced his trial and violated his constitutional right to due process.  The trial court vacated Nelson's convictions, finding that the government violated Nelson's due process rights by presenting false and misleading expert testimony, and ordered a new trial.  The government appeals the trial court's order.  The government is only appealing the trial court's

---

[1]  D.C. Code §§ 22-2401, -3202 (1989), recodified at D.C. Code §§ 22-2101, -4502 (2012 Repl.); D.C. Code §§ 22-501, -3202 (1989), recodified at D.C. Code §§ 22-401, -4502 (2012 Repl.); D.C. Code §§ 22-2101, -3202 (1989), recodified at D.C. Code §§ 22-2001, -4502 (2012 Repl.); D.C. Code §§ 22-1801(a), -3202 (1989), recodified at D.C. Code §§ 22-801(a), -4502 (2012 Repl.); and D.C. Code § 22-3204 (1989), recodified at D.C. Code § 22-4504 (2012 Repl.), respectively.

[2]  We also remanded the case for the trial court to hold a *Monroe-Farrell* hearing on Nelson's pre-trial claim of ineffective assistance of counsel – Nelson claimed his trial counsel was too inexperienced to handle his case.  *Nelson v. United States*, 601 A.2d 582, 591-92 (D.C. 1991) (citing *Monroe v. United States*, 389 A.2d 811 (D.C. 1978); *Farrell v. United States*, 391 A.2d 755 (D.C. 1978)).  The trial court thereafter held the *Monroe-Farrell* hearing and ultimately denied Nelson's claim, concluding that Nelson's trial counsel was not ineffective as she was adequately prepared for trial.  Nelson appealed that decision and we affirmed the trial court's denial.

decision to vacate Nelson's convictions for AWIKWA, armed kidnapping, and CPWL. The government concedes that the hair fiber comparison testimony was false, but maintains that it was not material to Nelson's conviction for the aforementioned charges. We affirm.

## I.  Factual and Procedural Background

### A. The Trial

The underlying facts of this case are recited fully in *Nelson*, *supra* note 2, 601 A.2d at 585-91, so we summarize them only in relevant part here. At trial, the government's evidence showed that Nelson shot and killed Robert Nichols and tried to kill Leonard Kelly in the late evening and early morning hours of February 12 and 13, 1985. Nelson's motive for Nichols's murder was unclear. Nelson had lived in Kelly's house for a short time, from December 1984 until January 1985, as a "roomer." *Id.* at 585. From the record, it appears that Nelson and Kelly met through Nob Hill, a bar that Kelly co-owned. *Id.* After Nelson moved out, Kelly

rented a room in his home to Nichols, whom he had known for several years.[3] *Id*. Kelly, who survived the assault, testified that Nelson entered Kelly's house, presumably with the keys he had used when he was Kelly's tenant, demanded his belongings that he had left at Kelly's house, and then shot Kelly in the back of the head. *Id*. at 585-86. After he shot Kelly, Nelson grabbed Kelly by the arm and pulled him into the garage, where a fight ensued. *Id*. at 586. Nelson tried to force Kelly into the trunk of Kelly's car, but instead, Kelly hit Nelson in the head with an umbrella and fled from Nelson. *Id*. Nelson chased Kelly up the street toward Nob Hill, slashed Kelly in the face several times with a knife, and hit Kelly in the head with a cinder block. *Id*. Ultimately, Nelson fled after Ralph Smith, the manager of Nob Hill and acquaintance of both Nelson and Kelly, came out of the restaurant and saw Nelson and Kelly. *Id*.

Several eyewitnesses corroborated Kelly's testimony. Kelly's next-door neighbor, Tami Battle, saw "a man wearing bib overalls, work boots, a rust-colored jacket, and something blue on his head" approach Kelly's home and enter it without "force" or "break[ing] anything to get in." *Id*. at 585. Inside her home,

---

[3] Kelly testified that Nelson and Nichols had never met, nor had Kelly mentioned to Nelson that Nichols became his tenant after Nelson moved out. *Nelson*, 601 A.2d at 585.

which shared a wall with Kelly's row house, Tami Battle and her brother, Troy Battle, could hear what "sounded like a fight" coming from Kelly's home, which ended with the sound of two gunshots and someone running through the house. *Id*. Another witness, neighbor Lynette Edwards, saw Nelson beat up Kelly near Nob Hill and saw Nelson flee the scene. *Id*. at 586. Kelly, Smith, and Edwards identified Nelson as the assailant and gave similar physical descriptions as Tami Battle – that Nelson was wearing bib overalls and a red, orange, or "rust-colored" shirt the evening of the assault. *Id*. at 586-87.

After Kelly called 9-1-1, officers investigated Kelly's house and found Nichols's body upstairs. *Id*. at 586-88. An autopsy later revealed that Nichols died from five gunshot wounds. *Id*. at 588. The police stopped Nelson about four blocks from Kelly's house. *Id*. at 587. He was found with a closed knife with blood on it and with blood on his socks and shoes. *Id*. The blood from Nelson's socks was tested and determined to be "compatible with either Kelly's or Nichols's blood," but not with Nelson's. *Id*. at 588.

Critical to the government's case against Nelson was Special Agent Michael Malone's expert testimony. Malone was a fifteen-year veteran so-called hair and fiber expert with the Federal Bureau of Investigation ("FBI") at the time he

testified at trial. Malone testified to his methodology, which involved placing the unknown hair fiber next to an identified hair fiber to compare the two fibers based on twenty characteristics and eliminate the comparison as a possible match. Malone testified that he examined and compared hair fibers taken from Nichols's body with hair from Nelson's head as well as fibers from the cinder block, with hair from Kelly's head, and concluded that the two sets of hairs "microscopically matched" and "were completely indistinguishable." When testifying to the validity of his results, Malone stated that he had examined "hairs from about 10,000 different people," and he had only twice ever failed to distinguish between two hair fibers. Malone admitted that hair fiber comparison analysis is not as precise as fingerprint analysis because "there are not two fingerprints exactly alike" but "it's possible" that two hair fibers belonging to two different people may be indistinguishable.

Throughout the government's opening, closing, and rebuttal arguments, it referenced Malone's expert testimony. The hair fiber testimony and evidence was critical to the government's case against Nelson for the Nichols murder as there was no other evidence that placed Nelson in Kelly's home at the time of Nichols's murder. Further, the government's theory of the case, that Nichols's murder provided the motive for the assault on Kelly to cover up the Nichols murder,

required the jury to draw the reasonable conclusion that the two crimes were connected and therefore the evidence was also connected. This point was emphasized by the government throughout the entire trial.

**B. Section 23-110 Motion to Vacate Appellant's Convictions and for a New Trial**

When Nelson's trial was held in 1986, hair fiber analysis was a generally accepted scientific methodology and expert testimony on the subject was used in criminal prosecutions. *See Jones v. United States*, 202 A.3d 1154, 1161 (D.C. 2019) (citing *Nelson*, 601 A.2d at 588). However, through scientific advances, post-conviction DNA testing became widely available, which led to exonerations for convictions which were based on no longer viable hair comparison evidence. *Jones*, 202 A.3d at 1161. This led to widespread internal investigations of criminal convictions involving hair comparison evidence. *Id*. In 1997, the Department of Justice ("DOJ") Office of the Inspector General ("OIG") released a report indicating misleading and/or illegal acts committed by Malone and other FBI laboratory examiners. THE FBI LABORATORY: AN INVESTIGATION INTO LABORATORY PRACTICES AND ALLEGED MISCONDUCT IN EXPLOSIVES-RELATED AND OTHER CASES (1997), https://oig.justice.gov/special/9704a/ https://perma.cc/4GGL-MC42 (last visited May 16, 2019).

In 2014, the DOJ OIG issued a follow-up report detailing significant irregularities in the work of thirteen FBI examiners, including Malone's work in Nelson's case. AN ASSESSMENT OF THE 1996 DEPARTMENT OF JUSTICE TASK FORCE REVIEW OF THE FBI LABORATORY (2014), http://perma.cc/M5RD-WXKS (last visited July 18, 2019). The report noted that Malone's testimony in Nelson's case about a hair fibers requiring at least fifteen known characteristics for comparison, has no scientific basis, and had no known scientific basis at the time Malone testified in Nelson's case. *Id*. at 52-53. According to the January 1977 FBI manual on hair microscopy, "hairs do not possess a sufficient number of unique microscopic characteristics to be positively identified as having originated from a particular person to the exclusion of all others." *Id*. at 53. At Nelson's trial, Malone testified that "one in 5,000" "Negro[s]" "would have hairs with all 20 of" the characteristics found in the hair sample alleged to be Nelson's. *Id*. The report stated that despite Malone's testimony, there have been no published studies to confirm Malone's conclusions as to the probability of hair matches. *Id*.

On April 24, 2015, Nelson requested that his convictions be vacated under D.C. Code § 23-110, based on the government's use of false or misleading hair fiber comparison testimony on due process grounds under *Napue*. The government opposed the motion, and, despite agreeing with Nelson as to the baselessness of the

hair testimony, maintained that Nelson failed to show that Malone's testimony prejudiced the verdict necessitating a new trial due to the overwhelming nature of Nelson's guilt. The government also argued that Malone's testimony on the limits of hair fiber evidence sufficiently mitigated any false testimony, and that the prosecutor made limited references to Malone's testimony.

On December 21, 2017, the trial court granted Nelson's motion.[4] The trial court noted that the government solicited and used false testimony at trial in violation of *Napue*. The trial court also determined that this false testimony was material to the jury's verdict. *Longus v. United States*, 52 A.3d 836, 845 (D.C. 2012). The trial court focused on the overwhelming emphasis that was put on the hair evidence against Nelson at trial – the hair evidence "directly placed [Nelson] in the house and in physical contact with the decedent in a way that no other evidence did, and it so undermined his denial of the murder as to cast significant doubt on Nelson's account of his altercation with his landlord." The emphasis that the government placed on Malone's testimony was particularly troubling as "Malone's testimony rested on a foundation of lies and exaggerations" –

---

[4] On March 4, 2016, the trial court heard arguments on Nelson's motion to vacate his convictions and for a new trial. However, the trial court did not hold a full evidentiary hearing, concluding that the existing record was sufficient to decide the motion.

"Malone's statistical conclusions were at best a guess, and at worst yet another fabrication." Following the trial court's decision, Nelson was released from prison pending a new trial. The government appealed.

## II. Legal Framework

Under § 23-110, a prisoner may move the court to vacate his sentence if "the sentence was imposed in violation of the Constitution of the United States or the laws of the District of Columbia." D.C. Code § 23-110(a). It is a violation of an individual's constitutional right to due process, a so-called *Napue* violation, for the government to produce or allow to go uncorrected false or misleading evidence. *Longus*, 52 A.3d at 844 (citing *Napue*, 360 U.S. at 269). This is because the knowing use of false testimony is "fundamentally unfair" as it "involve[s] a corruption of the truth-seeking function of the trial process." *United States v. Agurs*, 427 U.S. 97, 103-04 (1976) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Napue*, 360 U.S. at 271). It follows that *Napue* violations require a two-factor showing that: (1) the government knowingly produced or allowed to go uncorrected, false or misleading evidence; and (2) the false or misleading evidence was material to the verdict. *Jones*, 202 A.3d at 1166. Only the second factor is at issue in this appeal.

Here, there is no dispute that Malone's testimony was false and misleading, in violation of *Napue*. Reversal and a new trial require, however, an additional showing that the false and misleading evidence prejudiced the defendant at trial. *O'Brien v. United States*, 962 A.2d 282, 314 (D.C. 2008). Specifically, there must be a "reasonable likelihood" that the false or misleading testimony could have affected the jury's verdict, *Hawthorne v. United States*, 504 A.2d 580, 589-90 (D.C. 1986) (quoting *Giglio*, 405 U.S. at 154), *see also Agurs*, 427 U.S. at 103, which is "substantively equivalent" to a determination that the false or misleading testimony was not harmless beyond a reasonable doubt. *Jones*, 202 A.3d at 1166-67 (quoting *Woodall v. United States*, 842 A.2d 690, 696 & n.6 (D.C. 2004)).

Under this strict standard, we do not review whether, in hindsight, the government's case was strong enough to maintain the conviction absent the tainted evidence; rather, we review the record to assess the "probable impact on the minds of an average jury." *Derrington v. United States*, 488 A.2d 1314, 1331 (D.C. 1985) (quoting *Harrington v. California*, 395 U.S. 250, 254 (1969)). To answer this question, we must determine the importance of the false testimony in the context of the trial, the extent to which the credibility of the witness was impeached, and the independent evidence of the defendant's guilt. *Hawthorne*,

504 A.2d at 591.  For example, a factor that weighs in favor of finding harmless error is if the tainted evidence was cumulative or duplicative of other evidence presented to the jury.  *See, e.g.*, *Hagans v. United States*, 96 A.3d 1, 20-22 (D.C. 2014); *see also Woodall*, 842 A.2d at 699 (holding that tainted eyewitness testimony was immaterial to the verdict as it was cumulative of and consistent with other eyewitness testimony).  We have held that a factor that may also weigh in favor of finding harmless error is when the evidence against the defendant is so overwhelming, and consists of "strong independent, circumstantial evidence," and other evidence to sufficiently mitigate any negative effect of the tainted evidence. *Hawthorne*, 504 A.2d at 591-92; *see also Brooks v. United States*, 367 A.2d 1297, 1309 (D.C. 1976) ("The traditional approach has been to focus on whether the untainted proof is so overwhelming that it fairly may be said that the same verdict would have been reached absent the challenged evidence.").

For *Napue* claims, we review the record *de novo*.  *Mitchell v. United States*, 101 A.3d 1004, 1007 (D.C. 2014); *Napue*, 360 U.S. at 271-72 (We make our "own independent examination of the record," including "reexamin[ing] the evidentiary basis on which those conclusions are founded." (citations and internal quotation marks omitted)).  Central to the parties' arguments in this appeal is their disagreement over which party bears the burden of proving materiality in a *Napue*

claim. *Compare Powell v. United States*, 880 A.2d 248, 257 (D.C. 2005) ("[T]he burden is on the appellant to demonstrate that he is entitled to relief.") *with Longus*, 52 A.3d at 845 (A new trial is warranted if "the government cannot show, beyond a reasonable doubt, that the false testimony was harmless in the context of appellant's trial."). We see no need to resolve this issue in this case. *Cf. M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) (We cannot overrule binding precedent, "such result can only be accomplished by this court en banc."). As we explained in *Jones*, there is little difference between requiring a defendant to show "a reasonable possibility that the evidence complained of might have contributed to the conviction," and requiring the government to show harmlessness beyond a reasonable doubt. 202 A.2d at 1167 (quoting *United States v. Bagley*, 473 U.S. 667, 680 n.9 (1985)). Here, we conclude that the allocation of burden would not change our resolution of this appeal.

### III. Discussion

On appeal, the government's sole substantive argument is that Malone's testimony was not material to the jury's verdict for the charges relating to the assault on Kelly. The government concedes that Malone's testimony was false and misleading. The government contends that the evidence against Nelson –

including Kelly's direct testimony, the testimony of three eyewitnesses who knew Nelson and Kelly, and other physical and scientific evidence – was so overwhelming that it rendered Malone's testimony harmless beyond a reasonable doubt.

Malone's testimony was critical in implicating Nelson for the crimes against Nichols and Kelly. For the Nichols murder, Malone testified that one hair found on Nichols's body "matched the head hairs of Mr. Nelson in all characteristics," "was completely indistinguishable from his head hair," and "was consistent with having originated from Mr. Nelson." Malone also testified to a second piece of hair taken from Nichols's body, stating that it "was completely indistinguishable, and therefore, consistent with having originated from Nelson." Malone further testified that a hair taken from Nelson's coat "microscopically matched the head hairs of Mr. Nichols" and "was completely indistinguishable from his head hair[,] and . . . consistent with having originated from Mr. Nichols." The government asked Malone the odds that the hairs found on Nichols's body and on Nelson's coat could have come from other individuals (a double false positive), to which Malone responded "one in 25,000,000." Malone also testified that he compared a hair found on the cinder block that Nelson used to assault Kelly with Kelly's head

hair and found that "they microscopically matched," "were completely indistinguishable," and were "consistent with having originated from Mr. Kelly."

The murder of Nichols and the assault on Kelly were tightly linked in time and space, and the connection of the two events was stressed by the prosecution several times. *Brooks*, 367 A.2d at 1310 (recognizing that our harmless error review includes assessing "the emphasis placed on [the false evidence] by the court or the parties"). The prosecutor repeatedly underscored this link. For example, in its opening statement, the prosecution emphasized to the jury that Nelson returned to the home a few hours after killing Nichols with "the desire to kill Leonard Kelly." The prosecutor said that the hair evidence would reveal "the identity of the murderer and the person who assaulted Mr. Kelly." Again, in closing argument, the prosecutor told the jury that the assault on Kelly was "another piece of circumstantial evidence" of the Nichols murder and in fact, it was "the *only* motive" for the Nichols murder. (Emphasis added). Also in closing argument, the prosecutor linked the two victims, explaining that Nelson returned to the house after killing Nichols "with the intent to kill" Kelly because Kelly was the "one person" who knew that Nelson had keys to the house and could "connect [him] with" Nichols's murder. The government also stated: "He had killed one man earlier in the evening. He went back to try to cover it up by killing Kelly, and it

didn't work." *See Morten v. United States*, 856 A.2d 595, 602 (D.C. 2004) ("A prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about whether the admission of the evidence was meant to be, and was, prejudicial." (cleaned up)). Indeed, the jury needed to find that Nichols's death created the motive for the attack on Kelly, and without such motive supported by Malone's testimony, Nelson had no reason to assault or kidnap Kelly.

Malone's testimony linking Nelson to Nichols's murder and the government's emphasis that the Nichols murder provided the motive for the Kelly assault drastically "impinged the character of the defense." *Brooks*, 367 A.2d at 1310 (citing *Fahy v. Connecticut*, 375 U.S. 85, 90-91 (1963)). Malone's false evidence was used to impeach Nelson when, on cross, the government asked Nelson, "At the time you gave that statement [to the police], you didn't know that a hair identical to yours had been found on the decedent's body, did you?" Malone's testimony was not only used to undermine Nelson's testimony, but in doing so, it also significantly undercut Nelson's self-defense claim in the case involving the assault against Kelly. The jury, after having heard Malone's compelling testimony implicating Nelson for Nichols's murder and providing the entire basis for the crimes against Kelly, could not accept Nelson's self-defense theory and easily discredited his self-defense claim. Importantly, Nelson presented compelling

evidence of his self-defense claim that Kelly killed Nichols, and, after Nelson refused to help Kelly move Nichols's body, Nelson got into a fight with Kelly. Nelson's version of events was also entirely consistent with the physical evidence that the government used to implicate Nelson in Kelly's attack: the blood drops on the kitchen and garage floors, the keys and open car trunk in the garage, the blood on Nelson's sock, the knife found on Nelson, and the gunshot wound to Kelly's head. All of the evidence was consistent with Nelson's claim that he stabbed Kelly in self-defense after Kelly attacked him with a knife. Aside from Kelly, none of the government's witnesses – Smith, Edwards, or Battle – testified to actually seeing Nelson with a pistol, knife, or any other weapon. Therefore, the foundational element that enabled the jury to discredit Nelson's self-defense claim was Malone's testimony, which placed him in Kelly's home earlier that evening and painted a picture of the events without consideration of Nelson's self-defense claim. Thus, regardless of who bears the burden, we are unable to conclude that Malone's testimony was harmless beyond a reasonable doubt. *See Longus*, 52 A.3d at 845.

The importance of Malone's testimony was also recognized and underscored following Nelson's trial. For example, the trial judge in Nelson's case noted that Malone's testimony "zing[ed] the odds so strong to" Nelson's guilt in Nichols's

murder. In Nelson's direct appeal, our court previously recognized that the hair evidence was the "most telling[]" evidence of Nelson's guilt in the murder charge. *Nelson*, 601 A.2d at 593. When Nelson's direct appeal was remanded for a *Monroe-Farrell* hearing, the trial judge remarked in his order that the hair evidence "was the second most important aspect of this case." The motion judge assigned to Nelson's § 23-110 motion also recognized that Malone's testimony was "the strongest evidence that the jury could have used" to convict Nelson of Nichols's murder.

The government maintains that even without Malone's false testimony, the evidence against Nelson was overwhelming – Kelly's version of events was corroborated by forensic and physical evidence, and eyewitness testimony. While true, we cannot say that the strength of this evidence overwhelmed Malone's unimpeached, false expert testimony, and the government's presentation of the two intertwined events. For example, in *Hawthorne*, we concluded likewise that there was "strong independent, circumstantial evidence of [the defendant's] guilt" and our analysis turned on whether the government's key witness's credibility had been sufficiently impeached. 504 A.2d at 591-92. Malone, however, was not impeached, but rather his testimony was the linchpin of the case and was the strongest evidence of Nelson's motive to attack Kelly.

The government also contends that Malone's false testimony was sufficiently tempered by Malone's acknowledgement that hair evidence is not as definitive as fingerprint evidence because there may be two hair fibers that came from two different people but that are indistinguishable. While this testimony potentially minimized Malone's false testimony, it in no way neutralized it or gave the jury a basis to discredit it. *See Jones*, 202 A.3d at 1169 (holding that the hair comparison expert's "acknowledgements that microscopic hair comparisons were 'not like a fingerprint' and 'not a basis for absolute personal identification' did little to detract from his seemingly impressive real life forensic experience in thousands of cases"). Indeed, we held in *Jones* that the jury did not need to find the hair expert's testimony "conclusive" to find it "reliable," implicating *Napue*. *Id*. Ultimately, our determination is not whether, in hindsight, there was enough evidence to convict if we just subtract Malone's testimony. *Derrington*, 488 A.2d at 1331. Our standard is whether there was a reasonable possibility that the false evidence tainted the trial. *Mitchell*, 101 A.3d at 1008 n.4.

Malone's testimony was also compelling because it carried an aura of reliability, as he was a veteran FBI special agent and expert in the field of hair comparison analysis. *See Motorola Inc. v. Murray*, 147 A.3d 751, 753 (D.C. 2016)

(en banc) (observing that expert or scientific testimony "possesses an aura of special reliability and trustworthiness" (citation and internal quotation marks omitted)).  Expert witnesses appear to be particularly reliable and trustworthy and Malone's background appeared to be exceptional.  *See id*.  Malone was a fifteen-year veteran FBI agent who had taught classes in the field of hair and fiber forensics, and who claimed to have examined hair from 10,000 different sources, and that he had given expert testimony on hair comparison analysis across the country in over 250 trials.  By all metrics, Malone appeared to be an extremely knowledgeable and trustworthy expert witness.  Malone also testified with a high degree of confidence in Nelson's case and he was not impeached.  After providing the jury with "a very short course on hair exams," he testified that he analyzed the hair fibers under three different microscopes and identified twenty characteristics.  The aura of reliability of Malone, bolstered by his impressive credentials, lack of impeachment, and high degree of confidence in Nelson's case, made Malone's testimony particularly powerful in Nelson's conviction.  *Cf. Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) (recognizing that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it" (citation and internal quotation marks omitted)).

## IV.    Conclusion

For the aforementioned reasons, we must affirm the trial court's order as we conclude that there is "a reasonable likelihood that [Malone's] perjured testimony could have affected the verdict." *O'Brien*, 962 A.2d at 315.  The hair evidence was so connected to the prosecution's motive theory that Nelson's act of murdering Nichols provided the motive for his assault and kidnapping of Kelly to hide Nichols's murder.  While there was evidence to support the jury's verdict, absent Malone's testimony, the evidence was not overwhelming but rather, the only evidence that physically linked Nelson to Nichols's murder, was Malone's testimony.  Finally, the government's use of Nichols's murder as a motive for the CPWL, AWIKWA, and kidnapping charges relating to Kelly, further solidified the significant impact that Malone's testimony had on the entire case.  Therefore, we cannot say with certainty that it was harmless beyond a reasonable doubt.

*Affirmed.*