*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CO-1104

MICHAEL A. JONES, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(FEL-3048-96)

(Hon. A. Franklin Burgess, Jr., Trial Judge;
Hon. Patricia A. Broderick, Motions Judge)

(Argued February 28, 2017                    Decided  March 7, 2019)

*Daniel Gonen*, Public Defender Service, with whom *Samia Fam* and *Jonathan W. Anderson*, Public Defender Service, were on the brief, for appellant.

*Valinda Jones*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Suzanne G. Curt*, *Timothy Lucas*, and *Nancy Boggs Jackson*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY,[1] *Chief Judge*, and GLICKMAN and THOMPSON, *Associate Judges*.

---

[1] Chief Judge Blackburne-Rigsby was an Associate Judge at the time oral argument was held on February 28, 2017. Chief Judge Blackburne-Rigsby assumed the duties of Chief Judge on March 18, 2017.

GLICKMAN, *Associate Judge*: Appellant Michael A. Jones was tried in Superior Court in October 1996 and convicted of armed robbery and other offenses. The present appeal is from the court's denial of his motions to vacate his convictions pursuant to D.C. Code § 23-110 (Repl. 2012) and for post-conviction DNA testing pursuant to the Innocence Protection Act (IPA), D.C. Code § 22-4133 (Repl. 2012).

The motions relate, in different ways, to microscopic hair comparison evidence introduced by the government at appellant's trial. Appearing as an expert witness, the FBI agent who performed the comparison testified that appellant's hair matched hair found in a hat left at the scene of the crimes. This expert testimony bolstered the identification of appellant as the perpetrator, which was the central issue in dispute at trial.

In the years since appellant's trial, the reliability of microscopic hair comparisons has been undermined, a development accelerated by numerous cases in which post-conviction DNA testing disproved the matches to which hair examiners had testified. In a 2009 report, the National Research Council of the National Academy of Sciences decried the methodological deficiencies of hair comparison identifications and concluded that there was "no scientific support for

the use of hair comparison for individualization in the absence of nuclear DNA."[2]

The Department of Justice eventually undertook a review of the thousands of cases predating the use of DNA testing in which the FBI had provided hair-comparison analysis. The Department completed its review of appellant's case in December 2014 and informed the parties that "a report or testimony regarding microscopic hair comparison analysis containing erroneous statements was used in this case." In his § 23-110 motion, appellant claimed that his due process rights were violated at his trial by the government's presentation of this false evidence. The court denied that claim in the proceedings below based on its determination that the false evidence did not have a material effect on the outcome of appellant's trial. Appellant now challenges that ruling. As materiality is the dispositive issue in our evaluation of the ruling, we must undertake in this opinion an in-depth review of the evidence and argument at trial.

The IPA motion presents other questions. Some years before the Justice Department commenced its review, appellant's case was taken up by law students participating in the Innocence Project at Catholic University's Columbus School of

---

[2] NATIONAL RESEARCH COUNCIL, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD 161 (2009) [referred to hereinafter as the NRC Report].

Law.  In September 2007 and again in March 2008, the students asked the Metropolitan Police Department (MPD) to find and make available the hair examined by the FBI and other physical evidence in the case so that the Innocence Project could subject it to DNA testing.  The MPD never produced this evidence and eventually reported that it had been destroyed.  In the proceedings on his IPA motion, appellant sought to have the hair evidence located and produced for DNA testing, or to have sanctions imposed on the government for its failure to preserve the evidence.  The court denied the IPA motion without a hearing based on its acceptance of the government's proffer that the hair evidence had been lost, and it did not consider appellant's request for sanctions.  Appellant contends the court erred in this ruling and asks us to remand for an evidentiary hearing on the issues presented by his IPA motion.

We conclude that appellant is entitled to vacatur of his convictions pursuant to § 23-110 because his due process rights were violated at trial.  We affirm the court's IPA ruling to the extent of the issues the court reached and decided, as we explain below.

## I.  Factual Background

### A. The Trial

The charges against appellant arose from a robbery on the night of March 20, 1996, at a convenience store located at 200 Rhode Island Avenue, N.W. Tsehay Woldeab, one of the proprietors, and Gashaye Zinabu, a recently hired stock clerk, were alone in the store when the robber entered it shortly after 8:00 p.m.[3]  The man was carrying a handgun and wearing two black ski hat-masks that covered his entire face except for his eyes.  He locked the front door behind him and walked directly to the secure interior room in which the store's cash register was located.  Although the only entrance to this room was through a locked door,

---

[3]  A few minutes earlier, a regular customer known to Ms. Woldeab as "David" had been in the store with a friend who wanted to return a soda she had purchased.  After engaging in an angry argument with David over this request, Woldeab returned the money and David and his friend departed.  This trivial encounter, seemingly unrelated to the robbery that ensued, took on potential significance at trial in light of Woldeab's testimony that she "associated" appellant with David, having frequently seen the two men together, and that she had had similar arguments over returning store merchandise with appellant.  In closing argument, defense counsel cited this interaction as a possible source of what he called "unconscious bias" that might explain why Woldeab – having just been put in mind of appellant and her past frustrations with him – had misidentified him as the robber.

the intruder apparently had a key and opened the door without difficulty.[4] He then went into the room and removed money from the cash register and also from a drawer containing lottery ticket proceeds and other cash.[5]

Next, the robber motioned with his gun for Woldeab and Zinabu to walk to the back of the store and for Zinabu to go into the employee bathroom located there. The robber shut the bathroom door behind him. Zinabu testified that he could look out through a horizontal "crack" at the top of the door, though "[i]t was hard [to see]."

The robber had other plans for Woldeab. After pointing his gun at her and pushing her over to an area where some boxes were stacked, he assaulted her by trying to forcibly remove her sweater. Woldeab resisted and a struggle ensued,

---

[4] Zinabu testified that the door to the cash register room was locked when he checked it two hours before the robbery and that no one had opened the door in the interim. Woldeab testified that she and her daughter possessed the only keys to the door, and that those keys were fully accounted for following the robbery. The evidence at trial nonetheless indicated that the robber also had a key.

[5] In closing argument, defense counsel argued that the robber's possession of a key to the cash register room and knowledge that a particular drawer in the room also contained money were reasons to think the robber had to be someone other than appellant (as there was no evidence explaining how appellant could have obtained the key or acquired such knowledge).

during which the robber managed to tear her bra.[6] As the fight continued, the robber put his gun down on a box. Woldeab grabbed it and called out to Zinabu for help, saying she had gotten hold of the weapon. Zinabu did not come to her aid; he testified that he stayed in the bathroom because he was still in shock and too afraid to come out. The robber wrested the gun away from Woldeab and struck her hard on the back of her head with it, opening up a painful wound that bled profusely.[7] The robber then got up and went to the front of the store.

At some point during the fighting, one of the robber's masks apparently became dislodged. Zinabu and Woldeab each testified that, at different times, they glimpsed his face and recognized appellant, a regular customer of the store whom they knew as "Mike" or "Michael."[8] Zinabu said this occurred when he peered through the crack in the bathroom door while Woldeab was still grappling with her

---

[6] The bra was introduced in evidence at trial and later was among the items of evidence sought from the police by the law students in Catholic University's Innocence Project. It is not the subject of this appeal, however.

[7] Woldeab testified that being hit on her head did not cause her to lose consciousness, become dizzy, or experience vision problems.

[8] Woldeab said appellant had visited the store on virtually a daily basis for the preceding four years. On cross-examination, she testified that they had argued "many times," and that the last time he was in the store before the robbery, they had gotten into an argument in which appellant cursed and shouted at her.

assailant. Woldeab, however, testified that she did not see the robber's face during the struggle. She said she first saw it only after he had gone back to the front of the store, and that she then said to him, "Michael, Michael, is that you, why you did this to me?"[9] The robber left the store without answering her.

Immediately after the robber left, Woldeab called 911 for help; the tape of the call was played at trial. In her testimony, Woldeab acknowledged being "very shocked and panicked" and "very emotional" (something the recording of the call also indicated), as well as tired, hurting, and bleeding from her head wound. While she was on the phone with the police, Woldeab simultaneously confronted Zinabu, telling him repeatedly that he should have come to her aid when she called him after grabbing the robber's gun, and pressing him to explain how Michael had opened the door to the secured area.[10] The officer who responded to Woldeab's call found her still "very upset" and bleeding from her head wound. She told the

---

[9] Zinabu left the bathroom only after the fighting had stopped. At that time, he heard Woldeab refer to the robber as "Michael." He testified that he was "upset" and "scared very much" and that he "could just barely see [the robber]" before the man departed.

[10] Woldeab testified that Zinabu told her the robber opened the door with a key. As this hearsay testimony was received without objection, it could be "properly considered by the trier of fact and given its full probative value." *Eldridge v. United States*, 492 A.2d 879, 883 (D.C. 1985).

officer that the robber was someone she knew named "Michael." Zinabu also spoke to the police on the night of the robbery, but he did not tell them anything about the identity of the robber at that time.

Woldeab did not go back to the store for three days, during which it was closed to customers. When she returned, she found a nondescript knit black hat in the back of the store where she had fought with the robber.[11] Woldeab recognized this hat as one she had seen appellant wearing that winter. She called the police, who took the hat and turned it over to the FBI for hair and fiber examination. A week later, Woldeab testified, appellant returned to the store at a time when she was not present.[12] There was no testimony elucidating what transpired on that occasion, nor any evidence explaining why appellant – if he actually *was* the

---

[11] In the trial transcript and the documentation generated in this case, the hat is sometimes referred to as a "ski mask," "mask," or "mask-hat," while a police property record describes it as a "black skull cap." Testimony suggests it might have been a hat worn by the robber on top of his mask or masks. "Knit black hat" appears to be an agreed-upon description.

[12] The prosecutor elicited this information by asking Woldeab, "Do you know whether Michael ever came back to the store?" When she gave her answer, which indicated that her information about his return was hearsay, the trial judge inquired whether the prosecution would be providing "admissible evidence" on this point. Woldeab then confirmed that she herself did not see Michael in the store after the robbery. It is not clear who did see him there or what the circumstances were; the subject was not pursued further. The testimony was not stricken, however, and both counsel treated it as true in closing argument.

robber – would have showed himself at the store knowing Woldeab had recognized him during the robbery (when she addressed him as "Michael").[13]

Appellant was arrested three weeks after the robbery, and a search warrant was executed at his home at that time. No incriminating evidence – no gun, no key to the cash register room, no mask or other clothing – was discovered in the search. The police obtained a hair sample from appellant to compare to any hairs found in the hat in the FBI's possession.

FBI Special Agent Robert Fram performed that comparison, and he was the government's final witness at appellant's trial. The court found Agent Fram qualified to testify as an expert in hair and fiber analysis. Fram's testimony extended to sixty-three pages of trial transcript. He began by explaining in detail what he referred to as "the science" of hair comparison based on the different microscopic characteristics of hair, which he described and illustrated for the jury with enlarged photographs. Fram testified that only when two hairs are "the same microscopically," meaning "all those characteristics [are found] to be the same throughout the length of the hair, distributed the same way," does he conclude that

---

[13] Defense counsel pointed out this incongruity in closing argument.

a hair in a known sample is "consistent with" a hair of unknown origin. Fram stated that while a hair comparison is "not like a fingerprint" and "not a basis for absolute personal identification," it is "very rare to find two people whose hairs I can't distinguish between." This is so rare, Fram said, that in the two to three thousand cases he personally had worked on, he "never had" two hairs from different people that were so close he could not distinguish them. In fact, Fram testified, on only two occasions in his seven-year career had *anyone* in the FBI Laboratory Hair and Fiber Unit come upon hairs from different people that could not be distinguished.

Turning to this case, Agent Fram testified that he had microscopically compared hairs removed from the hat found in the store to known samples obtained from appellant. He showed the jury enlarged photographs of those hairs and pointed out that appellant's sample displayed features that were "unusual" and seldom seen. According to Fram, the hairs removed from the hat "exhibit the same microscopic characteristics as hairs from the known sample from the defendant," and Fram's "professional opinion" was that the hat hairs were "consistent with" appellant's. On cross-examination, Fram acknowledged again that hair comparison evidence "cannot be conclusively identifying," but he then reiterated that, "in my experience, it's rare to find two people whose hairs I can't distinguish between."

Defense counsel was unable, in cross-examining Fram, to make a meaningful dent in his testimony.

In his initial closing argument, the prosecutor emphasized the reliability of Agent Fram's "professional opinion," based on "the science," that there is a "match" between appellant's hair and the hairs removed from the hat found at the scene:

> [T]hink about somebody like Mr. Fra[m] from the FBI who spends all day locked to a microscope looking at hair after hair . . . , fiber after fiber. It's his whole job. And he was able to bring these blowup pictures to you to show, you know these four, they match these other four. These are [a match], in my professional opinion from looking at hairs day in and day out, and only on a couple of occasions . . . not being able to dispositively say after 7 years only twice have I been fooled to say, you know, I can't really tell. *All the other times he can tell you. . . .* What's important is that he's trained to examine these things and the science is not fingerprints, this is not DNA, but, he says, *this is as much as we can say about the science is that it's a match.*

(Emphases added.) Defense counsel could not refute Fram's conclusions, though he argued that the eyewitnesses' identifications were dubious given the circumstances in which they were made and other factors, and that Fram's hair comparison was not "conclusive" proof of identity. In rebuttal, the prosecutor

again emphasized the virtual certainty of Fram's opinion and how "remarkabl[y]" it bolstered the eyewitnesses:

> If it's true that that . . . compelling eyewitness identification was wrong, then think how remarkable it must be for that FBI Agent to look at a hair that looks just like his from that hat. Isn't that remarkable? If it's true that the eyewitness identification is wrong, then it must be true that that agent found a hair that looks just like his after all that experience of his, and all the hairs that he's looked at where he's only seen that happen on two occasions out of 7 years, day to day hair after hair after hair, think how remarkable that must be alone. If it's true, what else must be true?

## B. § 23-110 Motion to Vacate Appellant's Convictions

At the time of appellant's trial in 1996, the use of microscopic hair comparisons to identify suspected individuals as the perpetrators of crimes was generally accepted as a valid and reliable forensic technique in criminal prosecutions.[14] This began to change when post-conviction DNA testing became widely available and led to prominent exonerations of defendants who had been convicted with hair comparison evidence. By 2009, the watershed NRC Report on

---

[14] *See, e.g.*, *State v. West*, 877 A.2d 787, 808 (Conn. 2005) ("The overwhelming majority of courts have deemed such evidence admissible."); *Velasquez v. United States*, 801 A.2d 72, 76 (D.C. 2002); *Nelson v. United States*, 601 A.2d 582, 588 (D.C. 1991) *Rindgo v. United States*, 411 A.2d 373, 375 (D.C. 1980).

the state of forensic science in the United States concluded that microscopic hair comparison analysis was useful for some purposes but deficient as a means of making positive identifications. The Report found there to be "no uniform standards on the number of features on which hairs must agree before an examiner may declare a 'match,'" and "[n]o scientifically accepted statistics . . . about the frequency with which particular characteristics of hair are distributed in the population."[15] The "lack of a statistical foundation" undermined the kinds of "probabilistic claims" made by microscopic hair examiners "based on their experience, as occurred in some DNA exoneration cases in which microscopic hair analysis evidence had been introduced during trial."[16] Noting that courts were beginning to "recognize[] that testimony linking microscopic hair analysis with particular defendants is highly unreliable,"[17] the Report concluded:

---

[15] NRC Report at 160.

[16] *Id.* The Report cited a 2002 FBI study that "found that, of 80 hair comparisons that were 'associated' through microscopic examinations, 9 of them (12.5 percent) were found in fact to come from different sources when reexamined through mtDNA analysis." *Id.* at 160-61 (footnote omitted). "This illustrates not only the imprecision of microscopic hair analyses," the Report observed, "but also the problem with using imprecise reporting terminology such as 'associated with,' which is not clearly defined and which can be misunderstood to imply individualization." *Id.* at 161.

[17] *Id.* (footnote omitted).

In cases where there seems to be a morphological match (based on microscopic examination), it must be confirmed using mtDNA analysis; microscopic studies alone are of limited probative value. The committee found no scientific support for the use of hair comparisons for individualization in the absence of nuclear DNA.[18]

In the wake of the DNA exonerations and the NRC Report, the Department of Justice undertook a review of all cases predating the routine use of mitochondrial DNA testing in which FBI examiners provided hair comparison analysis. In a letter dated December 23, 2014, the Department advised the United States Attorney for the District of Columbia and appellant that its review had "determined that a report or testimony regarding microscopic hair comparison analysis containing erroneous statements was used in this case." More specifically, the letter stated that Agent Fram's testimony at appellant's trial "included statements that exceeded the limits of science in one or more of the following ways and were, therefore, invalid:"

(1) the examiner stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others . . . ; (2) the examiner assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to

---

[18] *Id.*

the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association . . . ; or (3) the examiner cite[d] the number of cases or hair analyses worked in the laboratory and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual . . . .[19]

A year before he received this notification, appellant already had moved for a new trial on the ground that the government's presentation of false or misleading hair comparison testimony had violated his right to due process. This motion was still pending when the Department of Justice notified appellant of the results of its review. In February 2015, he filed a supplement to his motion apprising the court of the new information. In response to the new trial motion, the government ultimately did not deny that it should have known Fram's testimony was false or misleading, and it waived any claim that the motion was procedurally barred. Nonetheless, the government opposed the motion. It rested its opposition on a single contention: that appellant could not demonstrate any reasonable possibility that he had been prejudiced by Agent Fram's testimony because, even without that

---

[19] According to the report of examination accompanying the letter, the FBI concluded only that Fram's testimony evinced the second type of error, not all three.

testimony, the other identification evidence at trial amounted to overwhelming proof of his guilt.

The court denied appellant's new trial motion without an evidentiary hearing. It concluded "there exists no reasonable probability, in the context of the entire record, that the inclusion of the expert testimony caused the jury to find the Defendant guilty of the crimes charged beyond a reasonable doubt where otherwise it would not have done so." The court stated that it based this conclusion on

> the strength of the eyewitness testimony; the fact that the government did not mention the hair and fiber analysis test in its opening statement and did not rely heavily on this evidence in its closing argument; and the fact that defense counsel extensively cross-examined the expert witness regarding the validity and reliability of the hair and fiber analysis test and defense counsel argued in its closing statement that the hair and fiber analysis were not absolute, which the expert admitted.

### C. IPA Motion for Post-Conviction DNA Testing

On September 26, 2007, law students working with the Catholic University of America Innocence Project on appellant's behalf wrote to Lieutenant Derek Gray, who was then in charge of the Evidence Control Branch (ECB) of the MPD, inquiring about the "location and status" of the physical evidence in appellant's case in order to make arrangements to inspect the items. The letter identified in

particular "three pieces of evidence – a ski mask [*sic*], containing human hair, and a brassiere."[20]  It noted that the hair had not been subjected to DNA testing, but that hair comparison analysis had been conducted. By March 31, 2008, none of this evidence had yet been located, and the students sent another letter requesting Lieutenant Gray to instruct cadets who were performing an audit of the evidence warehouse to "keep an eye out for evidence pertaining to" appellant and certain other individuals.

On December 20, 2013, appellant moved pursuant to the IPA for post-conviction DNA testing of the "ski mask" and the hairs that had been found in it.[21] His motion stated that the law students acting on his behalf had been told by an MPD sergeant that physical evidence relating to his case had been destroyed on May 5, 2008.  Nonetheless, the motion suggested that a property report relating to appellant's case contained a bar code number for a "black skull cap" that might reflect the mask's presence and help determine its location in the then-new MPD evidence warehouse (to which property from the old warehouse had been

---

[20]  The FBI returned the hat and hair to the MPD on or about July 31, 1996, with the hair analyst's report.  This physical evidence was introduced in evidence at appellant's trial and, following his conviction, was returned to the MPD for storage.

[21]  The motion did not seek testing of the bra.

transferred).[22]  The motion asserted that "[i]t is the government's burden to produce the evidence or to prove why it cannot be produced."  The only relief appellant requested, however, was a court order for DNA testing of the hairs and mask; the motion did not seek sanctions for the destruction of evidence or an evidentiary hearing.

In its May 2, 2014, opposition to appellant's motion, the government reported that members of the Evidence Control Division (ECD; another name, apparently, for the ECB) had conducted an "exhaustive search" for the hat and hairs and were unable to find them; that property records indicated that "[o]n or about May 5, 2008, an unknown member of MPD's ECD destroyed the evidence in this case"; that the responsible Assistant United States Attorneys (AUSAs) who had handled appellant's case and Lieutenant Derek Gray had not authorized this destruction; and that based on the property records and the search, Lieutenant Debra Manigault, the current Chief Property Clerk (and Lieutenant Gray's

---

[22] The undated property report, a Police Department (PD) Form 81, was an exhibit to appellant's motion.  It mentions only the item it describes as a "black skull cap," and provides no information concerning the hairs that the FBI had removed from it and examined.  An annotation on the PD 81 states that "Property is to be preserved in reference to a possible appeal involving the Innocence Project at the Columbus School of Law, the Catholic University of America."

successor) "has opined" that the evidence is no longer in the MPD's actual or constructive possession.

In support of these representations, the government submitted documentation relating to the handling and maintenance of the evidence together with affidavits of the AUSAs and Lieutenants Manigault and Gray. As the documentation showed, separate bar codes were assigned in the MPD's computerized evidence control system (called FileOnQ) to the hat and to a pair of pill boxes containing the hairs examined by Agent Fram. The FileOnQ database entries for each bar code were included with the government's response. They describe the items as "blk skull hat" and "2 small box[es]." The entries cryptically state that the boxes were "destroyed" as of May 5, 2008, and that the hat, according to "old data imported" into the database on May 13, 2009, was in the "property room." The available documentation disclosed no further information as to the whereabouts or the fate of the evidence. Physical searches were conducted for them in response to appellant's motion for DNA testing.

In pertinent part, Lieutenant Manigault's affidavit states that a member of her staff recalled that a search for the same evidence already had been conducted

one or two years earlier at the behest of the Catholic University Innocence

Project.[23] "Nevertheless," Lieutenant Manigault stated, her staff

> re-examined the existing hand-written records, computer
> data entries, evidence bins and shelves previously
> assigned to this evidence, as well as the mezzanine boxes
> referenced in Lieutenant Gray's affidavit [where relevant
> handwritten records, if any remained, would have been
> stored] and found no evidence associated with this case
> and little evidence helpful in clarifying its disposition.
> The only evidence which was helpful . . . was a few data
> entries in our File-on-Q computer system, which
> indicated that the evidence had been destroyed on May 5,
> 2008. This entry was consistent with the negative results
> of our search.

Lieutenant Manigault went on to explain that a records search found no evidence

identifying who destroyed the evidence, no documentation authorizing its release

or destruction, and no data entries or other documentation suggesting the evidence

had been removed to another location or agency.

Accordingly, the government asked the court to deny appellant's motion for

DNA testing as moot. It added that unless appellant denied its affiants' assertions

---

[23] In his affidavit, Lieutenant Gray confirmed that the evidence in appellant's case could not be found in a search of the former MPD evidence warehouse in 2012.

or had contrary evidence, the question of whether a hearing is required on the motion is confided to the court's discretion.

In his reply, appellant did not challenge the sufficiency or accuracy of the affidavits, the reasonableness and thoroughness of the search, or the conclusion that the evidence he sought for DNA testing had been destroyed and was no longer in the government's possession. He did not request more information about the search or contend that a hearing was necessary to explore those issues further. Rather, appellant argued that the government had violated its duty under the IPA to preserve biological evidence,[24] and that its destruction or loss of the evidence therefore was "at the very least negligent" and possibly more culpable.[25] Appellant

---

[24] *See* D.C. Code § 22-4134 (a) ("Law enforcement agencies shall preserve biological material that was seized or recovered as evidence in the investigation or prosecution that resulted in the conviction . . . for a crime of violence and not consumed in previous DNA testing for 5 years or as long as any person incarcerated in connection with that case or investigation remains in custody, whichever is longer.").

[25] Appellant argued that the government's destruction of the evidence may have been "much more than negligent," i.e., grossly negligent or even in bad faith, given that it occurred shortly after the evidence had been requested by the Catholic University students, and "[d]epending on what is learned through discovery and at an evidentiary hearing regarding the existence or nonexistence of policies and procedures for fulfilling MPD's statutory duty to safeguard the evidence, and the adequacy of those procedures, as well as the circumstances of the destruction of the evidence."

argued that fairness therefore required the court, in considering his pending § 23-110 motion to vacate his conviction, to impose a sanction on the government as a remedy for the loss. At a minimum, he urged, the court should draw an adverse inference against the government, i.e., infer that DNA testing would have shown that he was not the source of the hair evidence. As additional sanctions, appellant argued, the court should grant discovery requests he had filed in connection with his § 23-110 motion for materials relating to the FBI's review of hair comparison cases, and also might consider vacating his convictions, dismissing the indictment, and granting his motion for a new trial, "as justice requires." To decide what sanctions would be appropriate, appellant requested an evidentiary hearing to determine "the question of the government's bad faith, negligence or gross negligence[] in violating its statutory duty."[26]

The court denied appellant's motion for DNA testing without a hearing on two alternative grounds. First, accepting the government's proffer that the MPD had conducted an "exhaustive" search, the court found that "[a]s of May 8 [*sic*], 2008," the evidence appellant sought to test was no longer in the MPD's actual or

---

[26] The court should consider the degree of the government's fault in deciding on an appropriate sanction, if any, for the loss of evidence. *See Weems v. United States*, 191 A.3d 296, 306 (D.C. 2018).

constructive possession. The court said it could not order DNA testing of the materials because they "no longer exist."[27] Second, the court stated that, regardless of the availability of the hair evidence, there was "no reasonable probability" that DNA testing would help appellant prove his actual innocence.[28] The court did not specifically address appellant's request that the government be sanctioned or his request for an evidentiary hearing to determine the proper sanction; it stated only that it found "no reason to believe that there was any bad faith in disposing of the targeted evidence."[29]

---

[27] Subject to an exception that does not apply in this case, biological material that was evidence in a defendant's case must be in the government's "actual or constructive possession" to be subject to post-conviction testing under the IPA. D.C. Code § 22-4133 (a)(2).

[28] An applicant for post-conviction DNA testing under the IPA must show "there is a reasonable probability that testing will produce non-cumulative evidence that would help establish that the applicant was actually innocent of the crime for which the applicant was convicted[.]" D.C. Code § 22-4133. *See (Wallace) Mitchell v. United States*, 80 A.3d 962, 970 (D.C. 2013); *Hood v. United States*, 28 A.3d 553, 564-66 (D.C. 2011); *Cuffey v. United States*, 976 A.2d 897, 899 (D.C. 2009). The court found no such likelihood in this case in view of what it called the "overwhelming" evidence of appellant's guilt at trial and the additional fact (which the government had brought to the court's attention) that, at a parole hearing in 2010, appellant "admitted and took full responsibility for the actions that led to his convictions stating that the official version of the offense is an accurate depiction of what actually happened."

[29] The court did not impose any sanctions on the government when it decided appellant's § 23-110 motion.

## II. Discussion

## A. The *Napue* Due Process Violation

Appellant claims he is entitled to a new trial based on what is commonly referred to as a *Napue* violation of his right to due process. A *Napue* violation occurs when the government presents or fails to correct testimony it knows to be, or should know to be, false or misleading.[30] The government has waived its procedural objections to appellant's *Napue* claim; it concedes that it presented false or misleading expert testimony at appellant's trial; it acknowledges that knowledge of the falsity of that testimony must be imputed to it notwithstanding the good faith of the prosecutor;[31] and it agrees that the sole issue with respect to the *Napue* claim is whether there is any reasonable likelihood that the false testimony could have affected the verdict.

---

[30] *See Napue v. Illinois,* 360 U.S. 264, 269 (1959); *see also Giglio v. United States,* 405 U.S. 150, 153 (1972); *Longus v. United States*, 52 A.3d 836, 844-45 (D.C. 2012) ("A bedrock principle of due process in a criminal trial is that the government may neither adduce or use false testimony nor allow testimony known to be false to stand uncorrected.").

[31] "'[T]he touchstone of due process' in cases such as this 'is the fairness of the trial, not the culpability of the prosecutor.'" *Woodall v. United States*, 842 A.2d 690, 697 (D.C. 2004) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).

When a *Napue* violation is shown to have occurred, "it entails a veritable hair trigger for setting aside the conviction."[32]  As the Supreme Court stated in *Giglio*, "[a] new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'"[33]  Like other courts, we have understood this as substantively equivalent to requiring reversal unless there is "no reasonable possibility that the falsehood affected the jury's verdict"[34] or unless the false testimony was "harmless beyond a reasonable doubt."[35]

As the government notes, however, these formulations of the standard for the materiality of false testimony warranting reversal do differ in what they imply regarding which party bears the burden of persuasion.  The first formulation implies it is the "appellant [who] must demonstrate . . . that there is a reasonable

---

[32] *United States v. Gale*, 314 F.3d 1, 4 (D.C. Cir. 2003).

[33] *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271).  *See also, e.g.*, *O'Brien v. United States*, 962 A.2d 282, 314 (D.C. 2008); *Hawthorne v. United States*, 504 A.2d 580, 589-90 (D.C. 1986).

[34] *Woodall*, 842 A.2d at 696 & n.6 ("[T]here is no substantive difference in these formulations." (citing *United States v. Bagley*, 473 U.S. 667, 678-79 & n.9 (1985)).

[35] *See (Keith) Mitchell v. United States*, 101 A.3d 1004, 1008 & n.4 (D.C. 2014) (stating that "harmlessness must be proven by the constitutional standard of beyond a reasonable doubt" and that this standard is "equivalent" to the "any 'reasonable likelihood'" standard).  *See also Longus*, 52 A.3d at 845.

likelihood that the [false or misleading] testimony could have affected the verdict," which is what this court said in *O'Brien*.[36] In contrast, the other two formulations imply that "the burden of showing harmlessness is on the government rather than the appellant[]," as this court said in *Mitchell*.[37] The parties before us disagree as to whom the burden of persuasion with respect to materiality properly belongs. The government argues that when, as here, we are faced with inconsistent holdings, "we are required to follow the earlier decision[s] rather than the later one[s],"[38] i.e., the rule as stated in *O'Brien* rather than as stated in *Mitchell*. Appellant disagrees, arguing that the burden-of-persuasion issue was not briefed or

---

[36] 962 A.2d at 315. *See also Powell v. United States*, 880 A.2d 248, 257 (D.C. 2005) ("[T]he burden is on the appellant to demonstrate that he is entitled to relief[.]").

[37] 101 A.3d at 1008. *See also Longus*, 52 A.3d at 845 (stating that defendant is entitled to a new trial if "the government cannot show, beyond a reasonable doubt, that the false testimony was harmless in the context of appellant's trial").

[38] *Thomas v. United States*, 731 A.2d 415, 421 n.6 (D.C. 1999). *See also M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) ("[N]o division of this court will overrule a prior decision of this court. . . . [S]uch [a] result can only be accomplished by this court en banc."). Moreover, the government asserts, the overwhelming weight of authority from other courts, federal and state, supports placing the burden of persuasion on the defendant. *See, e.g., United States v. Burch*, 156 F.3d 1315, 1328-29 (D.C. Cir. 1998) ("Even if appellant could establish that the prosecution either sponsored or failed to correct false testimony, he cannot satisfy the materiality test for prosecutorial misconduct articulated in *Napue* and reiterated in *Giglio* . . . ." (footnote omitted)).

analyzed in, or material to the outcome of, the earlier decisions, as he claims it was for the first time in this jurisdiction in *Longus* and *Mitchell*.[39]

We consider it unnecessary to decide which party in this case bears the burden of persuasion with respect to the materiality of the *Napue* violation. Practically speaking, whether we follow *O'Brien* or *Mitchell*, there is "little, if any difference between a rule formulated, as in *Napue*, in terms of 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction,' and a rule 'requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"[40] Either way, our determination of materiality is *de novo* based on our "own independent examination of the record," including the

---

[39] *See Hobson v. District of Columbia*, 686 A.2d 194, 198 (D.C. 1996) ("We have recently reiterated that 'a point of law merely assumed in an opinion, not discussed, is not authoritative,' . . . and that principles of *stare decisis* do not apply 'unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question.'" (quoting *District of Columbia v. Sierra Club*, 670 A.2d 354, 360 (D.C. 1996)). For similar reasons, appellant also discounts the significance of other courts' decisions cited by the government.

[40] *Bagley*, 473 U.S. at 680 n.9 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)) (internal quotations omitted).

"evidentiary basis" of the lower court's ruling.[41]

For present purposes, we assume, without deciding, that it is the defendant's burden to establish the materiality of false testimony to support a *Napue* claim. We shall assess whether appellant has shown any reasonable likelihood – in other words, a reasonable possibility – that Agent Fram's false and misleading testimony could have affected the verdict. In the proceedings below on appellant's *Napue* claim, the court did not apply this test and did not determine whether there existed a reasonable possibility that Fram's testimony affected the verdict. Instead, the court proceeded on the premise that "for due process purposes it must be reasonably *probable* (and not merely *possible*)" (emphasis added) that the challenged testimony caused the jury to find appellant guilty. Having drawn that distinction, the court found only that there existed "no reasonable probability" that the expert testimony caused the jury to find appellant guilty. In this respect, the court erred. The "reasonable probability" standard of materiality does not apply to *Napue* claims.[42] The effect of the court's error was to impose too demanding a

---

[41] *Napue*, 360 U.S. at 271-72. *See, e.g.*, *(Keith) Mitchell*, 101 A.3d at 1008.

[42] The "reasonable probability" standard of materiality applies to *Brady* violations (involving the suppression of evidence favorable to the defense), *see Strickler v. Greene*, 527 U.S. 263, 281 (1999), and in some other contexts, but the Supreme Court has explained that it has applied a "strict[er] standard of

*(continued…)*

burden of proof on appellant. The difference is significant. As this court has explained,

> When a defendant is required to show a "reasonable probability" of prejudice in order to obtain post-conviction relief for a violation of his constitutional rights, the harm of which he complains . . . must be significant enough that it "undermines confidence" in the trial's outcome. This means more than a mere possibility of prejudice.[43]

For several reasons, we conclude there is a reasonable possibility that Agent Fram's false or misleading hair comparison testimony swayed the jury to convict appellant.

To begin with, the testimony was far from merely cumulative evidence of appellant's guilt. Fram's unrefuted hair comparison, replete with photographic exhibits to enhance its credibility and impact, constituted powerful, independent,

---

*(continued...)*
materiality" to convictions obtained by the knowing use of false testimony "not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *United States v. Agurs*, 427 U.S. 97, 104 (1976). In its order in this case, the court cited *Heath v. United States*, 26 A.3d 266, 280 (2011), as requiring a showing of "reasonable probability" rather than "reasonable possibility." *Heath*, however, did not involve a *Napue* claim and did not suggest that a "reasonable probability" standard governed such claims.

43 *Hood v. United States*, 28 A.3d 553, 564 (D.C. 2011) (footnotes omitted).

"scientific" proof positively identifying appellant as the robber to a high degree of certainty – a degree of certainty that the prosecutor emphasized to the jury in both his initial and rebuttal arguments and that defense counsel had no means to rebut. There is every reason to suppose the lay jury found Fram's testimony highly persuasive.[44] His acknowledgements that microscopic hair comparisons were "not like a fingerprint" and "not a basis for absolute personal identification" did little to detract from his seemingly impressive real life forensic experience in thousands of cases showing how "very rare" it was to find matching hairs from two different people (and how skillful he personally claimed to be in distinguishing hairs from different sources). The jury did not have to find Fram's hair comparison "conclusive" to find it very reliable indeed. The prosecutor knew what he was doing when, in rebuttal, he urged the jurors to credit the eyewitness identifications because it would have been so "remarkable" for Fram's finding of a match to be wrong. There is good reason to conclude that, "[g]iven the prosecutor's own forceful reliance on [it, Fram's hair comparison testimony] cannot be said – as a

---

[44] *See United States. v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) (en banc) ("Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors . . . ."); *United States v. Smith*, 869 F.2d 348, 352 (7th Cir. 1989) ("The tendency of testimony on scientific techniques to mislead the jury relates to the fact that, because of the apparent objectivity of opinions with a scientific basis, the jury may cloak such evidence in an aura of mystic infallibility." (internal quotation marks omitted)).

matter of reasonable possibility – to have had no effect on the jury's conclusion[.]"[45]

The remainder of the prosecution's case rested on the eyewitness identifications of Woldeab and Zinabu. Identifications of "long-time acquaintance[s]" often are thought to "contain[] strong elements of reliability."[46] Even so, anyone who has ever mistaken a stranger for a friend knows that such identifications come with no guarantee of infallibility. This court has seen cases in which errors in the admission or exclusion of evidence could not be deemed harmless despite eyewitness identifications by persons who thought they already knew the culprit.[47] We have disavowed the notion that, "as a matter of law, identifications of known acquaintances are inherently stronger than identifications of strangers without looking at the other evidence in the particular case."[48]

---

[45] *Morten v. United States*, 856 A.2d 595, 602 (D.C. 2004). This court often has recognized that the prosecutor's "own estimate of his case, and of its reception by the jury at the time, is . . . a highly relevant measure now of the likelihood of prejudice." *Id.* (quoting *Allen v. United States,* 837 A.2d 917, 923 (D.C. 2003)).

[46] *Redmond v. United States*, 829 A.2d 229, 234 (D.C. 2003). *See also Snowden v. United States*, 52 A.3d 858, 871 (D.C. 2012).

[47] *See, e.g.*, *Haney v. United States*, 120 A.3d 608, 613-14 (D.C. 2015); *(Keith) Mitchell*, 101 A.3d at 1006, 1009.

[48] *Heath*, 26 A.3d at 282 n.53.

Subtracting the hair comparison testimony, the evidence in this case provided a number of reasons (many of them explicitly urged on the jury by defense counsel) why the jury might have doubted the reliability of the identifications of appellant as the robber.

First, as defense counsel argued, the witnesses' identifications were based on brief exposures to the robber's face under violent, stressful, and traumatic circumstances that militated against their making a reliable identification. Zinabu was virtually paralyzed with fear and shock and his view was obscured when he momentarily glimpsed the robber's face through a narrow crack in the bathroom door. Woldeab was injured, in pain and in shock, and bleeding profusely when she saw the robber's face for only "a few seconds" after being pistol-whipped on the back of her head. Moreover, upon seeing the robber's face, Woldeab asked, "Michael, is that you . . .?"– a question the jury could have understood as evincing her actual uncertainty in the moment about his identity.

Second, as defense counsel also pointed out, the identification testimony of the two witnesses appeared to be in conflict: Zinabu claimed the robber's mask came off and revealed his face while Woldeab still was grappling with him, yet she herself did not see his face during their struggle even though she likely was

looking straight at him. Arguably, this inconsistency provided additional reason to doubt the identification testimony.

Third, defense counsel urged the jury to consider that each identification may have been influenced by bias and suggestivity. In Woldeab's case, counsel proposed that this could have been triggered by her verbal altercation just minutes before the robbery with someone she associated with appellant, combined with her recent history of similar angry arguments with appellant himself. As for Zinabu, he arguably had every reason to agree with Woldeab's identification (which he heard her declare before he told anyone he could identify the robber himself) in order to mollify her anger at him for failing to come to her aid and to deflect any suspicion that he was complicit in the robbery – especially after Woldeab questioned him about how the robber could have gotten through the locked door.

Fourth, the strength of the prosecution's case apart from the hair analysis was diminished by the absence of any incriminating physical evidence.[49] Of

---

[49] We do not consider the hat to be incriminating merely because Woldeab testified that it looked like one she had seen appellant wearing. As defense counsel argued (without any counterargument by the prosecutor), there was nothing unique or unusual about the hat – nothing "to distinguish it from thousands of other hats that you might see on any vending stand on your way between here and the edge of

*(continued…)*

particular note, the police search of appellant and his residence when he was arrested turned up no evidence of any kind linking him to the robbery – no key to the cash register room, no mask or other clothing, no gun, and no apparent proceeds.[50]  The absence of such evidence can be explained away, of course; but we have appreciated that it also "may provide the reasonable doubt that moves a jury to acquit."[51]

Fifth, the evidence indicated that the robber possessed a key to the cash register room, that he knew to look for money in a particular drawer in that room, and that he was familiar with the layout of the back of the store and knew there was an employee bathroom located there.  There was no evidence that appellant,

---

*(continued…)*
town."  It was only Fram's testimony about the hair found in the hat that made it a significant piece of evidence.

[50] *See Miller v. United States*, 444 A.2d 13, 16 (D.C. 1982) (finding that the government's case was not overwhelming where there was an eyewitness identification of the defendant, but he "was not found with the fruits of the crime or the implements of the crime in his possession.").

[51] *Greer v. United States*, 697 A.2d 1207, 1210 (D.C. 1997) ("'Indeed, it is the absence of evidence upon [material] matters that may provide the reasonable doubt that moves a jury to acquit.'  Thus, in assessing whether the government has met its burden of proving guilt beyond a reasonable doubt, the jury may properly consider not only the evidence presented but also the lack of any evidence that the government, in the particular circumstances of the case, might reasonably be expected to present.") (quoting *United States v. Poindexter*, 942 F.2d 354, 360 (6th Cir. 1991)).

who was only a customer of the store, albeit a frequent one, could have obtained the closely held key or the kind of knowledge the robber seemed to possess. This provided a reason to doubt that appellant was the perpetrator; it suggested that the robber was not appellant, but someone like a (present or former) store employee.

Sixth, the evidence (which the prosecutor himself elicited and appeared to credit in his closing argument) that appellant returned to the store shortly after it reopened also tended to cast doubt on his identification as the robber – for if he had been the robber, he presumably would have stayed away since he knew the store's owner had recognized him and could expect her to call the police on sight of him.

Taking all these considerations into account, we come to the conclusion that appellant has demonstrated a reasonable likelihood that Agent Fram's false or misleading testimony could have affected the jury's verdict. Without that powerful testimony, the evidence of appellant's guilt was still strong, but it was not overwhelming, and we find it plausible that the jury could have entertained a reasonable doubt and acquitted him. Appellant therefore is entitled to have his convictions set aside; the government may seek to retry him if it so chooses.

## B. Destruction of the Hat and Hair Evidence

Appellant argues that the motions court erred in denying without a hearing his application for post-conviction DNA testing.  Appellant claims he was entitled to an evidentiary hearing on (1) whether the government conducted a reasonable search to substantiate its assertion that the hat and hair evidence had been lost or destroyed; and (2) whether the government should be sanctioned for failing to preserve the evidence.  "For claims under the IPA, the question whether a hearing is required is confided to the sound discretion of the trial court."[52]

In lieu of holding an evidentiary hearing on the adequacy of the MPD's search, the court accepted the government's proffer.  In our view the court exercised its discretion reasonably in doing so, because the proffer, though it was somewhat conclusory and not as detailed as it might have been, was substantial and appellant did not contest it or request a hearing on the issue.

When the government opposes an application for post-conviction DNA testing on the ground that the sought-after biological material does not exist, "it must proffer evidence" showing that it conducted "a reasonable search" for the

---

[52] *(Wallace) Mitchell*, 80 A.3d at 977 (quotation marks omitted).

material, "meaning an extensive search in any place the evidence could reasonably be found."[53] The government provided such a proffer in this case; according to the sworn affidavit of the ECB chief, it did not merely rely on the computerized property records and individuals' memories, but conducted a physical search in the "evidence bins and shelves previously assigned to this evidence" and the boxes in which any handwritten records pertaining to the evidence might have been stored.[54] For the first time on appeal, appellant complains that the proffer did not include an affidavit from anyone on Lieutenant Manigault's staff who actually performed the search at her direction and "thus had personal knowledge of exactly where and how thoroughly they looked."[55] This objection comes too late; in the absence of any timely complaint about the lack of additional detail, appellant must be deemed to have accepted the supervisor's summary of the search undertaken as accurate and adequate. Appellant also complains that the search was limited to locations that had been "assigned" to the missing evidence, whereas misplaced

---

[53] *Id.* at 970. "The trial court's inquiry is not whether the material does not exist or no longer exists, but whether the government has performed a 'reasonable search.'" *Id.* at 970-71.

[54] By way of contrast, in *(Wallace) Mitchell* this court deemed a search inadequate where "we d[id] not know where the government checked, what it checked for, or whom it checked with – if it checked at all." *Id.* at 970.

[55] Brief for Appellant at 40.

evidence could have been in "other areas of the [ECB] or facilities where the evidence … was previously stored or transported."[56]   But appellant did not raise this objection below either, and even now he does not identify a single specific location that should have been searched because "the evidence could reasonably be found" there.  The obligation to conduct a reasonable search does not require a top-to-bottom search of every property warehouse, building, and police vehicle in which the evidence conceivably might have been at any time.[57]   Finally, appellant complains – once again for the first time on appeal – that the government did not contact the FBI Crime Laboratory to determine whether it retained any of the hair samples examined by Agent Fram.  There is no merit to this belated objection, however; the government submitted documentation and cited trial testimony confirming that the FBI returned the hat and hairs to the MPD for use at trial, and no reason appears why the FBI would have silently held any evidence back when it did so.  Appellant's suggestion that the FBI might have retained any of this evidence thus is contrary to the record and nothing but unmoored speculation.  It

---

[56] *Id.*

[57] We have difficulty imagining that such an unfocused search would be at all feasible, given the huge volume of evidence contained in the MPD evidence warehouse alone – "approximately 300,000 items or more," according to the affidavit of Lieutenant Manigault.

does not suggest any failure to "search in any place the evidence could reasonably be found."[58]

Once the government has proffered evidence of a reasonable search in support of its representation that the biological material in question does not exist, the applicant for DNA testing must be afforded "an opportunity to weigh in on the procedure the government employed in reaching that conclusion," which entails an "opportunity to probe, challenge, or otherwise respond to the statements in the [proffer] before a decision can be rendered."[59] "[I]f the court determines that there is a *genuine* factual dispute as to whether the evidence exists, ordinarily the court should hold a hearing."[60] In this case, appellant was given the opportunity to probe and challenge the government's proffer, but he did not take it. He raised no questions or objections as to the adequacy of the search, he did not present the court with a "genuine dispute" as to the existence of the hat and hair evidence, and he did not request an evidentiary hearing to explore those seemingly uncontested

---

[58] *(Wallace) Mitchell*, 80 A.3d at 970.

[59] *Id.* at 969 (internal quotation marks omitted).

[60] *Id.* (quoting *Arey v. State*, 929 A.2d 501, 510 (Md. 2007)).

issues. Under the circumstances, the court therefore was not obliged to hold an evidentiary hearing on whether the government performed a reasonable search.[61]

Appellant did request an evidentiary hearing to determine appropriate sanctions that the court might have imposed on the government in deciding appellant's then pending § 23-110 motion to vacate his convictions on account of the *Napue* violation. As we have noted, the court all but ignored that request and denied the § 23-110 motion without holding a hearing on the government's degree of fault in destroying evidence or imposing any sanctions on the government. Nonetheless, we do not decide whether the court should have imposed sanctions for the government's IPA violation or held a hearing to answer that question in deciding appellant's *Napue* claim pursuant to § 23-110.[62] The unresolved question

---

[61] Given this conclusion, we find it unnecessary to reach the court's alternative reason for denying an evidentiary hearing, its finding of no reasonable probability that DNA testing would produce non-cumulative evidence helpful in establishing appellant's actual innocence. We refrain from expressing any view on that issue.

[62] Although the extent of the government's blameworthiness is a factual issue that one would expect to be resolved after taking evidence, the appropriateness of imposing sanctions on the government in the § 23-110 matter for its putatively wrongful failure to preserve the hair evidence is far from obvious. Even if the hair had not been lost and post-conviction DNA testing of it would have tended to exculpate appellant, the test results would have been new evidence that could not have been available to appellant at the time of trial. While the DNA test results might have supplied grounds for relief under the IPA, they therefore

*(continued…)*

of sanctions need be addressed only if and when the government chooses to retry appellant and he then renews his request for sanctions based on the possibility that DNA testing might have generated favorable evidence for him in the future prosecution. The relevant circumstances may be unforeseeably different in that event; for under our case law, the court might need to determine and weigh not only the government's blameworthiness (which, we agree, may necessitate an evidentiary hearing), but also the importance of the lost evidence; the prejudice to appellant and the overall impact of its loss in the context of the anticipated new trial; and the effect of any proposed sanction on the administration of justice.[63] These matters are not ripe for decision now.

---

*(continued…)*
would not be a basis for challenging the constitutionality of appellant's conviction pursuant to § 23-110. It thus is not clear why the government's post-conviction loss of the hair evidence should affect the court's resolution of appellant's unrelated due process claim under *Napue*. *Cf. Turner v. United States*, 116 A.3d 894, 917-18 (D.C. 2015) (holding that newly discovered exculpatory evidence that did not exist and could not have been available at the time of trial is not relevant to whether the government violated its *Brady* obligations).

[63] *See Weems v. United States*, 191 A.3d 296, 306 (D.C. 2018).

## III. Conclusion

For the foregoing reasons, we reverse the denial of appellant's motion to vacate his convictions under D.C. Code § 23-110, affirm the denial of his motion for post-conviction DNA testing under the IPA, and remand for vacatur of the convictions and such further proceedings as may be appropriate.

*So ordered.*